## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

| | |
|---|---|
| **In re:**<br><br>**THE SKI MARKET LTD., INC.,**<br><br>Debtor. | **Chapter 11**<br>**Case No. 09-_____-___** |

### DEBTOR'S MOTION FOR (I) APPROVAL OF BIDDING PROCEDURES AND SALE PROCEDURES AND (II) ENTRY OF AN ORDER AUTHORIZING (A) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES
### (Emergency Hearing Requested Regarding Bidding and Sale Procedures)

NOW COMES The Ski Market Ltd., Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), and hereby moves this Court (the "Motion") to authorize a sale (the "Sale") pursuant to 11 U.S.C. §§ 363 and 365, Fed. R. Bankr. P. 2002(a)(2) and 6004, and MLBR 2002-5 and 6004-1 of substantially all assets used and useful in the operation of the Debtor's business (the "Assets"), and assumption and assignment of certain unexpired leases (the "Unexpired Leases"), as further described herein and in the Debtor's Notice of Intended (A) Sale of Substantially All Assets Used and Useful in the Operation of the Debtor's Business and (B) Assumption and Assignment of Certain Unexpired Leases ("Notice of Sale") filed herewith.

The Debtor also seeks approval of the form of Notice of Sale, the proposed bidding procedures (the "Bidding Procedures") and sale procedures (the "Sale Procedures") described in detail herein and set forth in this Motion.[1]

---

[1]   The Debtor has filed herewith the Affidavit of Andrew Ferguson (the "Ferguson Affidavit") and relies thereon in support of this Motion and the relief requested herein.

The Debtor and its first priority secured creditor, South Shore Savings Bank ("SSSB"), have negotiated cash collateral terms that require the Debtor to obtain Court approval of the Sale on or before January 26, 2010 and to close the Sale on or before February 1, 2010 (the "Closing Deadline"). **Therefore, the Debtor requests that the Court schedule a hearing on the proposed Sale on or before January 26, 2010.**

The Debtor further requests that the Sale be free and clear of all claims, liens, interests, and encumbrances (collectively, "Interests" or an "Interest") asserted by any entity, with any such Interest in the Assets, when established, attaching to the proceeds realized from the sale of the Assets in the same order of priority subject, if necessary, to a later determination by the Bankruptcy Court of the validity, extent, perfection and amount of such Interest, with the exception of the Interests of SSSB, which interests are limited only by the "carve out" agreement (the "Carve-Out Agreement") discussed in detail herein. With respect to any Interests in or to the Debtor's Assets other than those of SSSB, any and all such Interests shall be subordinated to any and all necessary administrative costs and expenses in connection with the Sale including, without limitation, the compensation of all professionals engaged by the Debtor and all expenses incurred in connection with the Debtor's operations during the Chapter 11 proceedings.

In support of this request, the Debtor submits the following:

I.   **FACTUAL BACKGROUND.**

1.      On December 29, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2.      Since the Petition Date, the Debtor has continued in the management of its business as debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No official

committee of unsecured creditors, trustee, or examiner has been appointed herein. The Debtor is aware of an ad hoc committee of unsecured creditors (the "Ad Hoc Committee") formed pre-petition and has provided a copy of this Motion to counsel for the Ad Hoc Committee.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(N).

4.      Venue of the Debtor's Chapter 11 case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    DEBTOR'S OPERATIONS.

5.      In 1958, the Debtor began its operations as a specialty retailer of outdoor sporting goods and apparel and initially operated under the name "St. Moritz Sports." At that time, and continuing to this day, the Debtor has remained a family owned and operated business.

6.      The Debtor continued its sporting goods retail operations and focused on winter sporting goods in particular. In 1971, the Debtor began operating under the name "Ski Market." In the early 1990's, the Debtor was one of the first full-service retailers of snowboards and has also marketed sporting goods under the trade-name "Underground Snowboard." Until recently, the Debtor operated 15 locations in the Northeast.

7.      Currently, the Debtor operates seven retail locations which feature a wide selection of skis, snowboards, bicycles, and skateboards, as well as related accessories and apparel.[2] The Debtor also offers a variety of services such as equipment rental and repairs. The Debtor believes that the "Ski Market" brand has significant value.

8.      The Debtor currently employs approximately 170 full-time and part-time employees ("Employees"). The Debtor expects that current employee levels will remain

---

[2]      Prior to the Petition Date, as part of its cost-cutting and restructuring process, the Debtor closed all but the remaining seven locations.

substantially the same during the Chapter 11 proceedings at least through the approval and closing of the Sale contemplated herein.

9.      In fiscal year 2009, which ran from April 1, 2008 – March 31, 2009, the Debtor had gross sales, net of returns, of approximately $22.5 million.  To date, for fiscal year 2010 (i.e., April 1, 2009 through mid-December 2009), the Debtor had gross sales, net of returns, of approximately $6.9 million.

10.     Notably, the Debtor's most profitable period of the year coincides with the ski season in the Northeast and, therefore, the Debtor typically operates profitably for the months of November through February.  Due to, among other things, the carrying costs of significant retail space through the spring, summer and early fall months, the Debtor has operated at a loss for the past few years.  The downturn in the economy and the negative impact on consumer spending during 2008 and 2009 exacerbated the Debtor's financial problems.

11.     In August of 2009, the Debtor engaged New England Business Exchange, Inc. ("NEBEX") to assist with the sale of the Debtor's operations as a going concern.  In November of 2009, the Debtor also engaged The O'Connor Group ("TOG") as financial consultants to assist, inter alia, with the preparation of financial information required for due diligence materials.

12.     The Debtor's efforts, assisted by NEBEX and TOG, have generated substantial interest from potential buyers, including both strategic buyers and liquidators.  To date, however, the Debtor has been unable to obtain a stalking horse offer.  To attempt to maximize sale value during the Debtor's most productive season, the Debtor seeks herein to establish bidding and sale procedures that will allow the Debtor to continue marketing efforts, solicit acceptable bids, and close a sale within the next 30 – 45 days.

13.     The Debtor has also diligently worked to negotiate cash collateral terms and a "carve out" with SSSB so that the Debtor will have sufficient cash to fund its operations during the Chapter 11 period through the Sale closing.  The Debtor is hopeful that the Sale will ultimately provide a benefit to the Debtor's bankruptcy estate (the "Estate") and its creditors.  At a minimum, however, the Debtor believes that the Estate will remain administratively solvent during the Chapter 11 operations.  In addition, the Estate will preserve all causes of action, if any, available to the Debtor including, without limitation, any actions pursuant to Bankruptcy Code §§ 544, 545, 547, 548 or 550.

14.     The Debtor has reached an agreement with SSSB, subject to Bankruptcy Court approval, regarding terms of use of SSSB's cash collateral including the scope of the Carve-Out.  The Debtor has filed a motion herewith seeking approval of the agreed-upon terms of use of SSSB's cash collateral (the "Cash Collateral Motion").

## III.   SECURED CREDITORS.

15.     Upon information and belief, and in accordance with MLBR 6004-1(c)(1)(B), the following creditors[3] have or may have security interests in the Assets:

(a)    SSSB.  As noted above, SSSB has a first priority lien on substantially all of the Debtor's Assets.  The balance of the Debtor's principal obligations to SSSB as of the Petition Date totaled approximately $4,229,000.00.

(b)    The Burton Corporation ("Burton").  Burton has recorded a UCC-1 Financing Statement that evidences a junior lien on inventory and non-inventory.  The balance of the Debtor's obligations to Burton as of the Petition Date totaled approximately $426,409.56;

(c)    Tecnica Group USA Corporation ("Tecnica").  Tecnica has recorded a UCC-1 Financing Statement that evidences a junior lien on inventory and

---

[3]   The Debtor has reviewed the website maintained by the Secretary of the Commonwealth of Massachusetts to confirm the status and scope of all UCC-1 Financing Statements of record.  The information provided herein related to secured creditors is consistent with those Financing Statements.  With the exception of the rights of SSSB, which are addressed in the Cash Collateral Motion, the Debtor reserves all rights regarding the validity, scope, and enforceability of all potential liens identified herein.

non-inventory.  The balance of the Debtor's obligations to Tecnica as of the Petition Date totaled approximately $437,954.54; and

(d)  Bell Sports, Inc. ("Bell Sports").  Bell Sports has recorded a UCC-1 Financing Statement that evidences a junior lien on of the Debtor's inventory, equipment, and goods.  The balance of the Debtor's obligations to Bell Sports as of the Petition Date totaled approximately $145,016.18.

16.    The Trustee will provide notice of this Motion, the Notice of Sale, and all pleadings related thereto to all creditors including, without limitation, the creditors identified in paragraph 15 above and all guarantor the Debtor's obligations to SSSB.

17.    With the exception of the interest of SSSB discussed below, to the extent that creditors and/or parties asserting any Interest in the Assets fail to timely object to the Sale as set forth in the attached Notice of Sale, those parties shall be deemed to have consented to the sale of the Assets free and clear of any lien, claim, interest or encumbrance, with any proceeds sought therefrom by any such creditors or interested parties being chargeable on a pro-rata basis with the cost of the Sale being incurred by the Estate and the preservation of the Assets and a proportionate share of the administrative expenses incurred by the Estate in connection with the Sale.  Further, SSSB shall have the right to object to any Sale and to "credit bid" at any Sale.

18.    Additionally, with the exception of claims against SSSB, the Debtor reserves the right pursuant to Bankruptcy Code § 506(c) to seek recovery of the reasonable and necessary costs and expenses for preserving or disposing of the Assets to the extent of any benefit conferred on the creditors, whether said Assets are sold or the creditor successfully objects to the intended Sale.

## IV.   PROPOSED BIDDING AND SALE PROCEDURES.

### A.   Continued Solicitation of Bids/Provision of Due Diligence Materials.

19.     As stated above, prior to the Petition Date, NEBEX contacted numerous potential purchasers regarding the possible acquisition of the Debtor.  Many potential purchasers have met with the Debtor, visited the retail locations, and reviewed available due diligence materials. Although the Debtor has not yet received a viable stalking horse offer, there is substantial interest among buyers and the Debtor anticipates that multiple bidders will participate in the bidding process.

20.     With the assistance of NEBEX, the Debtor has prepared materials which are available to potential bidders (the "Due Diligence Materials").  Upon execution of a standard confidentiality agreement, the Debtor will provide the Due Diligence Materials to any interested bidder.  The Due Diligence Materials include, among other things:

   (a)   Balance sheet as of November 29, 2009;

   (b)   Monthly store-by-store and consolidated profit and loss statements through November 29, 2009;

   (c)   Current summary inventory reports by store, by merchandise category and by age;

   (d)   Confidential Descriptive Memorandum regarding the Debtor, its history, current operations, and potential;

   (e)   Various additional financial reports;

   (f)   A pro forma spreadsheet of top performing stores; and

   (g)   Other information typically included in due diligence materials of this nature.

21.     The Debtor will continue to work with NEBEX to circulate Due Diligence Materials and provide additional information to potential bidders.

## B.   Sale Procedures Set Forth in the Notice of Sale.

22.     As set forth in the Notice of Sale filed herewith, the Debtor has proposed certain procedures with respect to the proposed Sale (i.e., the Sale Procedures). The Sale Procedures are designed to allow the Debtor to continue to solicit bids and close a Sale during its most profitable season, thus preserving good-will and maximizing value for creditors.

23.     Among other things, the Notice of Sale (a) describes the Assets, (b) identifies unexpired leases (the "Unexpired Leases") and proposed "cure" amounts, (c) solicits offers for the Assets or any portion thereof, and (d) establishes procedures and a timeline for bidding and to close a Sale.

24.     The Notice of Sale also specifies that the Assets to be sold may include certain "personally identifiable Information" as that term is defined in Bankruptcy Code § 101(41A) ("PII"). The Debtor's PII includes, without limitation, a marketing database of customer contact information, information compiled in connection with the Debtor's "rewards" program, and, potentially, other PII typically compiled by a retailer of consumer goods. In compliance with Bankruptcy Code § 363(a) and MLBR 6004-1(f), the Debtor has filed herewith a request for the appointment of a "consumer privacy ombudsman." In the event that the Debtor receives any offers for its Assets, or a portion thereof, which offers include PII, then the Debtor will request that the appointed ombudsman file a report regarding the proposed sale of the PII and participate in the Sale pursuant to Bankruptcy Code § 332.

25.     Notably, if strategic bidders participate in the Sale, which the Debtor hopes will occur, those potential buyers will find value in the Debtor's PII. The Debtor will work with any such strategic bidder to ensure that the rights of consumers are provided due and proper consideration.

26.     The proposed Sale Procedures provide that potential bidders must timely submit offers by a deadline to be established by this Court, provide a Deposit (as defined in paragraph 32 below) to the Debtor prior to the bid deadline, attend any sale hearing conducted by this Court, and close the Sale by February 1, 2010 (unless otherwise agreed to in writing by the Debtor and SSSB).

27.     As noted herein, the Debtor requests that this Court establish a deadline of January 22, 2010 for interested parties to submit bids and provide the Deposit to the Debtor.  The Debtor also requests that this Court schedule a sale hearing on or about January 26, 2010.  This requested timeline will allow the Debtor to comply with its agreements with SSSB and also maximize value during the winter season.

28.     The Notice of Sale also provides that a bidder may submit a bid for the assumption and assignment of certain Unexpired Leases under Bankruptcy Code § 365.  The bidder, if successful, will be obligated to "cure" all monetary and non-monetary defaults related to the assumption and assignment of any leases selected for assumption and assignment.  A list of the Debtor's Unexpired Leases, with proposed "cure amounts" for each, is attached to the Notice of Sale as Schedule 1.

29.     The Notice of Sale also establishes a deadline for non-debtor parties to the Unexpired Leases to object to assumption and assignment and/or to the Debtor's proposed cure amounts.

30.     Further, the Notice of Sale also provides notice to creditors, including potential secured creditors, that the Debtor proposes to sell the Assets free and clear of liens, claims, interests, and encumbrances and provides an opportunity for all creditors and interested parties to object to the proposed Sale.

C.    **Bid Procedures/Requirements to be a Qualified Bidder.**

31.     Also as set forth in the proposed Notice of Sale, the Debtor requests that potential

bidders be required to conform to the specific Bid Procedures established in the Notice of Sale to be

deemed a qualified bidder ("Qualified Bidder") at the hearing scheduled for the Sale.  Among other

things, the Bid Procedures are designed to allow the Debtor to comply with the terms of cash

collateral use agreed-upon with SSSB and to ensure procedural fairness among interested bidders.

32.     The Debtor requests that, in order to be deemed a Qualified Bidder, bidders must

comply with the following Bid Procedures, which are also described in the Notice of Sale:

    (a)    Bids must be in writing and are due by January 22, 2010 at 4:00 p.m. EST
(the "Bid Deadline");

    (b)    Bids must be filed with the Bankruptcy Court on or before the Bid
Deadline and copies must be provided contemporaneously to (i) Debtor's
undersigned counsel and (ii) counsel to SSSB;

    (c)    Bids must be accompanied by a deposit of $100,000.00 (the "Deposit");

    (d)    Deposits must be delivered, in good funds, to Debtor's undersigned
counsel on or before the Bid Deadline;

    (e)    Any party submitting a bid must be present at any Sale hearing scheduled
by the Bankruptcy Court;

    (f)    All bids must identify with specificity the Assets that the bidder proposes
to purchase;

    (g)    If bids include Unexpired Leases which the bidder proposes the Debtor
assume and assign to the bidder, then the bid shall (i) specify the proposed
monetary and non-monetary "cure"; (ii) state that the bidder shall assume

all responsibility for the "cure"; and (iii) include materials that establish

"adequate assurances" required by Bankruptcy Code § 365, which

materials shall be provided only to undersigned counsel for the Debtor;

(h)     Bids must state whether the Assets to be purchased include any

"personally identifiable information" (i.e., PII, as previously defined) and,

if so, the bidder must provide to undersigned counsel to the Debtor copies

of any existing policies of the bidder that address treatment of PII;[4] and

(i)     Bids must specifically indicate an ability to close the Sale on or before

February 1, 2010.

**D.     Approval of the Form of Notice of Sale.**

33.     In order to maximize the value of the Assets for the Estate and to move forward

on the Debtor's proposed timeline, the Debtor requests that this Court (a) find that the Sale

Procedures and Bid Procedures set forth in the Notice of Sale submitted herewith are appropriate

and authorize and approve same; and (b) schedule a hearing on the Sale on or before January 26,

2010.

**V.     CARVE-OUT AGREEMENT.**

34.     As noted above, SSSB has a first-priority lien on the Assets and, prior to the

Petition Date, the Debtor negotiated with SSSB the terms of use of SSSB's cash collateral.

Based on those negotiations, the Debtor has filed herewith the Cash Collateral Motion and a

proposed stipulation and interim order related thereto (the "Cash Collateral Stipulation").

35.     Among other things, the Cash Collateral Stipulation will grant to SSSB a post-

petition lien on all of the Debtor's assets to the extent of any diminution of value in SSSB's pre-

---

[4]     The Debtor has filed herewith a Motion for the Appointment of a Consumer Privacy Ombudsman. Therefore, if
the Debtor receives one or more Qualified Bids that include PII in the Assets to be purchased, then the Debtor
will be able to seek input, if required, from the appointed Ombudsman without delay.

petition collateral (the "Post-Petition Lien"). SSSB already has an all-asset lien granted by the

Debtor pre-petition that secures principal obligations in excess of $4,229,000.00 (the "Pre-

Petition Lien"; together with the Post-Petition Lien, the "SSSB Liens").

36.     To maximize the value of the Assets through the Sale process proposed herein,

the Debtor and SSSB have agreed to a "carve-out" agreement (i.e., the Carve-Out Agreement)[5]

whereby SSSB has agreed to provide a carve-out to the Estate as follows:

(a)     $75,000 to pay any and all accrued but unpaid administrative expenses

incurred during the Chapter 11 operations including, without limitation,

professional fees and expenses incurred during the Chapter 11 proceedings

by professionals engaged by the Debtor and any creditors' committee (the

"Administrative Claim Fund")[6];  and

(b)     $25,000 from any sale proceeds received from the Sale of the Assets (the

"Unsecured Creditor Fund"; together with the Administrative Claim Fund,

the "Carve-Out").  Any payment to NEBEX pursuant to its pending

engagement motion shall be in addition to the Carve-Out.

37.     As part of the consideration for the Carve-Out described in paragraph 36 above

and described in detail in the Cash Collateral Motion, the Debtor has agreed to waive any and all

claims against SSSB including, without limitation, the right to pursue avoidance actions against

---

[5]     The exact terms of the Carve-Out Agreement are set forth in the stipulation and interim order approving the
Debtor's use of cash collateral which the Debtor filed herewith (the "Cash Collateral Order"). Nothing herein is
intended to, or shall be deemed to, alter or modify the terms of the Cash Collateral Order and if any conflicting
provisions exist, the Cash Collateral Order shall control the terms of the Cash Collateral Agreement.

[6]     Immediately prior to the Petition Date, the Debtor funded the Administrative Claim Fund and the
Administrative Claim Fund is currently held by Debtor's counsel in a segregated account. The Debtor has
budgeted to pay professional expenses in the ordinary course through the Chapter 11 operational period and
nothing herein shall limit the Debtor's budgeted payments. All such payments remain subject to Court
approval.

SSSB. The Debtor is aware of no such claims and therefore believes that the waiver is necessary and appropriate.

38.     Therefore, it is in the best interest of the Estate that the Court approve the terms of the Carve-Out as set forth herein and as part of the Sale.

## VI.   EMERGENCY HEARING REQUESTED.

39.     The Debtor has filed herewith a Motion for Emergency Hearing on First Day Pleadings and Request to Shorten Notice Period (the "Motion for Emergency Hearing"). In the Motion for Emergency Hearing, the Debtor has requested that this Court schedule a hearing as soon as practicable regarding the Sale Procedures portion of the within Motion. Based upon the January 26, 2010 deadline for the Debtor to obtain an order approving the Sale, it may be necessary to shorten the 20-day notice period for sales required by Fed. R. Bankr. P. 2002(a).

40.     The Debtor believes that a shortened notice period is justified and appropriate herein because (a) the Debtor has been actively marketing the Assets pre-petition and, therefore, likely bidders have the information required to compile bids; (b) the Debtor must close the Sale quickly to maximize Asset values; (c) assuming a hearing on the Motion for Emergency Hearings on or before January 8, 2010, the Debtor will provide at least 14 days notice, which is ample notice in this situation, and (d) the Cash Collateral Stipulation requires that the Debtor obtain a sale order on or before January 26, 2010.

## VI.   AUTHORITY AND COMPLIANCE WITH MLBR 6004-1(c)(1)(F).

41.     As noted above, the Debtor seeks authority to sell the Assets free and clear of all Interests pursuant to Bankruptcy Code § 363(f), with all Interests attaching to the proceeds of the sale to the same extent priority and validity that existed on the Petition Date. Bankruptcy Code

§ 363 requires Court approval of any sale outside of the ordinary course, after notice and hearing.

See Bankruptcy Code § 363(a), (b) and (f).

42.     Courts have approved a sale of a debtor's assets if the sale and sale process

represent an exercise of reasonable business judgment by the debtor. See In re Martin, 91 F.3d

389, 396 (3d Cir. 1996); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); see also

Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Thomas McKinnon

Securities, Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Coastal Indus., Inc., 63 B.R. 361,

367 (Bankr. N.D. Ohio 1986); In re Baldwin United Corp., 43 B.R. 888 (Bankr. S.D. Ohio

1984).

43.     As discussed above, the Debtor's operations are most valuable during the winter

months.  To generate the most interest for the Debtor's operations as a going-concern, the Debtor

proposes a fast sale process with a closing expected by February 1, 2010.  This will allow the

successful buyer to settle into operations during the Debtor's most active, and profitable, season.

The Debtor believes that this timeline will maximize the value of the Estate.  Even if the best and

highest offer is that of a liquidator, the Debtor will still get the best return during the few

remaining winter months.

44.     The Debtor further submits that it is appropriate to sell the Assets free and clear of

all Interests, pursuant to Bankruptcy Code § 363(f), with all such Interests attaching to the net

proceeds of the Sale.  The Debtor believes that one or more of the tests under Bankruptcy Code

§ 363(f) will be satisfied.  Among other things, the Debtor believes that SSSB and all holders of

junior liens may consent to the Sale pursuant to Bankruptcy Code § 363(f)(2).  In the event of an

objection, however, the Debtor reserves the right to move forward under alternative sections of

Bankruptcy Code § 363(f), depending on the results of the Sale.

45.    As discussed in detail above, in light of the timing issues, the Debtor seeks to sell its Assets via the Sale, rather than through a Chapter 11 plan process which, even if abbreviated, would certainly take more than the 32 days contemplated herein.

46.    In further compliance with MLBR 6004-1(c)(1)(F), the Debtor provides the following information, all of which is supported by the Ferguson Affidavit, which would typically be provided in a disclosure statement to a Chapter 11 plan:

     (a)    The Debtor has evaluated many possible scenarios for the sale of its assets and liabilities and determined that a sale as a going-concern is most likely to provide the best return for creditors. Specifically, in the event of a liquidating proceeding, the Debtor will lose virtually all of the good-will associated with on-going operations and its brand will be further damaged. The resulting assets available for distribution to creditors will consist primarily of the Debtor's remaining inventory. As of the Petition Date, the Debtor's inventory had a book value at cost of approximately $2,658,418. Without further reducing the inventory value to a "liquidation value" and deducting "liquidation costs", the value of the inventory would be insufficient to satisfy the Debtor's obligations to SSSB's. Therefore, short-term operations coupled with a Sale are in the best interest of creditors.

     (b)    The Debtor has also negotiated a Carve-Out with SSSB that will minimize the potential for administrative insolvency and also provide an Unsecured Creditor Fund which will potentially fund pre-petition claims. If SSSB were to, instead, liquidate its collateral without the Sale contemplated

herein, then creditors would have no access to the Unsecured Creditor
Fund;

(c)     The Debtor has cooperated with the Ad Hoc Committee both pre-petition
and post-petition. As a result, the Ad Hoc Committee is well-informed
and the Debtor is hopeful that the Ad Hoc Committee will support the Sale
proposed herein; and

(d)     With the exception of the Carve-Out, the Debtor seeks only to distribute
any Sale proceeds consistent with the absolute priority rule. Specifically,
the Debtor expects to pay-down its obligations to SSSB, less the Carve-
Out, and, if excess proceeds remain, those proceeds will be available to
the Estate to fund and pay creditors in order of the priorities set forth in
the Bankruptcy Code.

47.     For the reasons discussed herein and in the Ferguson Affidavit, the Debtor has
determined, in its business judgment that the proposed Sale, Sale Procedures, and Bidding
Procedures are in the best interest of the Estate and its creditors. Therefore, the Debtor seeks
Court approval of the Sale, Sale Procedures and Bidding Procedures.

**VII.    <u>MISCELLANEOUS</u>**

48.     Given the requirement of the Cash Collateral Stipulation that the Debtor close the
Sale on or before February 1, 2010, the Debtor requests that the Court waive the stay imposed by
Bankruptcy Rule 6004(g).

49.     The Debtor submits that the Sale contemplated herein is in the best interest of the
Estate.

WHEREFORE, the Trustee respectfully requests that this Court:

a.    Schedule a hearing on the Bid Procedures and Sale Procedures portion of this Motion as soon as practicable, but in any event by Friday, January 8, 2010;

b.    Schedule a hearing on the proposed Sale on or before January 26, 2010;

c.    Authorize the Debtor to sell the Assets described in the Notice of Sale filed herewith, free and clear of all liens, claims, interests, and encumbrances by any entity, with any and all such interests in the Assets, when established, attaching to the proceeds realized from the sale of the Assets in the same order of priority subject, if necessary, to later determination by the Bankruptcy Court of the validity, extent and perfection of such interest;

d.    Authorize but not direct the Debtor to assume and assign any and all Unexpired Leases listed on Schedule 1 of the Notice of Sale and establish the cure claims, if any, in the amounts listed thereon;

e.    Require that any creditor and/or party in interest claiming an interest in the Assets, with the exception of SSSB, be liable to the Estate for (1) the *pro-rata* cost of the private sale of the Assets, (2) the costs incurred in the preservation of the Assets, and (3) a proportionate share of the administrative expenses incurred by the Debtor in preparing and conducting the Sale;

f.    Authorize SSSB to "credit bid" at any Sale;

g.    Find that the Notice of Sale filed herewith is appropriate in form and content for purposes of noticing interested parties and creditors;

h.   Authorize and approve the Bid Procedures and Sale Procedures proposed herein
and set forth in the Notice of Sale;

i.   Waive the stay imposed by Bankruptcy Rule 6004(g); and

j.   Grant the Debtor such other and further relief as is just.

Respectfully submitted,

THE SKI MARKET LTD., INC.

By its proposed counsel,


/s/ Christine E. Devine
Joseph H. Baldiga, BBO #549963
Christine E. Devine, BBO #566990
Gina M. Barbieri, BBO # 670596
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502
Email: bankrupt@mirickoconnell.com

Dated: December 29, 2009

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

In re:

**THE SKI MARKET LTD., INC.,**

**Chapter 11**
**Case No. 09-_____-___**

Debtor.

## NOTICE OF INTENDED (A) SALE OF SUBSTANTIALLY ALL ASSETS USED AND USEFUL IN THE OPERATION OF THE DEBTOR'S BUSINESS AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES

TO CREDITORS AND PARTIES OF INTEREST:

NOTICE IS HEREBY GIVEN pursuant to 11 U.S.C. §§ 363 and 365, Fed. R. Bankr. P. 2002(a)(2) and 6004 and MLBR 2002-5 and 6004-1 that The Ski Market Ltd., Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), intends to sell (the "Sale") the Debtor's right, title and interest in substantially all assets used and useful in the operation of the Debtor's business (the "Assets"), and further intends in conjunction therewith to assume and assign certain unexpired leases (the "Unexpired Leases"), all upon the following terms and conditions:

1.      DESCRIPTION OF PROPERTY TO BE SOLD:  All of the Debtor's right, title and interest in the Debtor's Assets and Unexpired Leases which consist primarily of the Debtor's going-concern operations as a retailer of winter sporting goods including skis, snowboards, bicycles, and skateboards as well as related accessories and apparel with seven operational locations.  The Debtor's Assets are described more specifically in certain Due Diligence

Materials that are available to interested parties upon request of the undersigned.[1] In addition,

the Debtor's Assets include certain personally identifiable information ("PII") including, without

limitation, a marketing database of customer contact information, information compiled in

connection with the Debtor's "rewards" program, and, potentially, other PII typically compiled

by a retailer of consumer goods.

PURCHASE PRICE:  The Debtor will consider any and all bids for purchase of the

Assets and/or Unexpired Leases including, without limitation, bids to purchase all Assets and

Unexpired Leases or any portion thereof ("Bid" or "Bids"). The Debtor reserves the right to

reject any and all Bids if the Debtor, in its sole discretion, determines that none of the Bids

submitted represents sufficient value for the Estate and its creditors.

QUALIFIED BIDDER – QUALIFIED BIDS: To participate in the Sale Hearing (as

discussed and defined below) a party must be deemed a qualified bidder ("Qualified Bidder").

To be a Qualified Bidder, a party must submit a timely bid that complies with the following

requirements ("Qualified Bid"):

(i)   Bids must be in writing and are due by January 22, 2010 at 4:00 p.m. EST
      (the "Bid Deadline");

(ii)  Bids must be filed with the United States Bankruptcy Court, McCormack
      Post Office and Court House, 5 Post Office Square, Suite 1150, Boston,
      MA 02109-3945, on or before the Bid Deadline;

(iii) Contemporaneous with filing a Bid with the Bankruptcy Court, copies
      must also be provided to (i) Debtor's counsel, Joseph H. Baldiga, Esq. and
      Christine E. Devine, Esq., Mirick O'Connell LLP, 1700 West Park Drive,
      Westborough, Massachusetts, 01581, jbaldiga@mirickoconnell.com,
      cdevine@mirickoconnell.com ("Debtor's Counsel"), and (ii) counsel to
      SSSB, William R. Moorman, Jr., Craig and Macauley Professional

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Debtor's Motion
      For (I) Approval of Bidding Procedures and Sale Procedures and (II) Entry of an Order Authorizing (A) Sale of
      Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B)
      Assumption and Assignment of Certain Unexpired Leases (the "Sale Motion").  A copy of the Sale Motion will
      be provided at no cost upon request by any potential purchaser.  Contact the undersigned attorney for copies.

Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, Boston, MA 02210, moorman@craigmacauley.com ("SSSB's Counsel");

(iv)    Bids must be accompanied by a deposit of $100,000.00 (the "Deposit");

(v)    Deposits must be delivered, in good funds, to Debtor's Counsel, on or before the Bid Deadline;

(vi)    Any party submitting a Bid must be present at the Sale Hearing (as defined below), or have a duly authorized representative present on its behalf;

(vii)    All Bids must identify with specificity the Assets and/or Unexpired Leases that the bidder proposes to purchase;

(viii)    If a Bid includes any Unexpired Leases which the bidder proposes to designate for assumption and assignment, then the Bid shall (i) specify the proposed monetary and non-monetary "cure"; (ii) state that the bidder shall assume all responsibility for the "cure"; and (iii) include materials that establish "adequate assurances" required by Bankruptcy Code § 365, which materials shall be provided only to Debtor's Counsel on or before the Bid Deadline;

(ix)    Bids must state whether the Assets to be purchased include any "personally identifiable information" as that term is defined in Bankruptcy Code § 101(41A) and, if so, provide to Debtor's Counsel (i) copies of any existing policies of the bidder that address treatment of PII and (ii) address and explain whether or not that bidder's purchase of the PII would be "consistent with" the Debtor's existing policies;[2] and

(x)    Bids must specifically indicate an ability to close the Sale on or before February 1, 2010.

DATE OF SALE: The Sale shall take place immediately after entry of the Bankruptcy Court's Order authorizing and approving such Sale and not later than February 1, 2010 unless otherwise agreed to in writing by the Debtor. The terms of the Sale are more particularly described in the Sale Motion, a copy of which is available at no cost upon request to Debtor's

---

[2] The Debtor has filed herewith a Motion for the Appointment of a Consumer Privacy Ombudsman. Therefore, if the Debtor receives one or more Qualified Bids that include PII in the Assets to be purchased, then the Debtor will be able to seek input from the appointed Ombudsman without delay.

Counsel.  The Sale shall take place at a location mutually agreed upon by the Debtor and the successful Qualified Bidder.

EXEMPTIONS:  To the best of the Debtor's knowledge and belief the Assets are not subject to State or Federal exemption laws.

METHOD OF SALE AND INTEREST OF PARTIES IN PROCEEDS:  **The sale of the Assets will be free and clear of all liens, claims, interests, and encumbrances asserted by any entity (collectively, the "Interests" or "Interest").**  With the exception of the Carve-Out Agreement set forth in the Sale Motion, any and all such Interests in the Assets, when established, shall attach to the proceeds realized from the sale of the Assets in the same order of priority that each such Interest existed prior to the sale, subject to later determination by the Bankruptcy Court of the validity, extent and perfection of such interest.  With respect to any Interests in or to the Debtor's Assets other than those of SSSB, any and all such Interests shall be subordinated to any and all necessary administrative costs and expenses in connection with the Sale including, without limitation, the compensation of all professionals engaged by the Debtor and all expenses incurred in connection with the Debtor's operations during the Chapter 11 proceedings.

OBJECTIONS AND/OR COUNTEROFFERS:  Please take notice that any and all objections to the Sale shall be filed in writing with the Clerk, United States Bankruptcy Court, McCormack Post Office and Court House, 5 Post Office Square, Suite 1150, Boston, MA 02109-3945, on or before January 22, 2010 at 4:00 p.m. (the "Objection Deadline").  A copy of any objection or higher offer also shall be served simultaneously upon Debtor's Counsel and SSSB's Counsel.  Any objection to the Sale must state with particularity the grounds for the objection

and why the Sale should not be authorized.  Objections to the Sale shall be governed by Fed. R. Bankr. P. 9014.

UNEXPIRED LEASES - OBJECTIONS:  Please take notice that any objections to the proposed assumption and assignment of any of the Unexpired Leases listed on Schedule 1 hereto including, without limitation, any objections to the "cure amounts" listed thereon, must be filed in writing by the Objection Deadline, and filed and served in accordance with the preceding paragraph, and must state with particularity the grounds for the objection.

HEARING: A hearing on the Sale Motion, objections or counteroffers is scheduled to take place on January _____, 2010 at _____.m. before the Honorable _____, United States Bankruptcy Judge, Courtroom No. _____, United States Bankruptcy Court, McCormack Post Office and Court House, 5 Post Office Square, Suite 1150, Boston, MA 02109-3945 (the "Sale Hearing").  Any party who has filed an objection or submitted a Bid must either (i) be present at the hearing or (ii) have a representative present at the hearing which representative is duly authorized to conduct bidding on behalf of that party, failing which the objection will be overruled or the Bid deemed to not be a Qualified Bid.  Only Qualified Bidders who have submitted Qualified Bids shall be entitled to participate at the Sale Hearing.

PROCEDURES FOR SALE HEARING:  At the Sale Hearing on the sale, the Court may:

    a.    Review Bids to determine which constitute Qualified Bids;

    b.    Consider any request by the Debtor to strike a Bid which the Debtor has determined does not constitute a Qualified Bid;

    c.    Determine further terms and conditions of the Sale;

    d.    Determine requirements for further competitive bidding;

    e.       Require one or more rounds of sealed or open bids from all Qualified

Bidders; and

    f.       Take evidence to resolve any issue of fact.

FAILURE TO CONSUMMATE TRANSACTION: A Deposit will be forfeited to the

Debtor if the Bidder approved by the Bankruptcy Court fails to complete the Sale by the required

Sale closing date.  If the purchaser approved by the Court fails to close the Sale, the Debtor may,

without further hearing, sell the Assets to the next highest Qualified Bidder.

Any questions concerning the Debtor's proposed Sale, the Sale Motion, or this Notice of

Sale, may be addressed to the undersigned Debtor's Counsel.

Respectfully submitted,

THE SKI MARKET LTD., INC.

By its counsel,

Joseph H. Baldiga, BBO #549963
Christine E. Devine, BBO #566990
Gina M. Barbieri, BBO # 670596
Mirick, O'Connell, DeMallie & Lougee, LLP
1700 West Park Drive
Westborough, MA 01581
Phone: (508) 791-8500
Fax:    (508) 791-8502
Email: bankrupt@modl.com

Dated: December __, 2009