## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

| | |
|---|---|
| **In re:**<br><br>**THE SKI MARKET LTD., INC.,**<br><br>Debtor. | Chapter 11<br>Case No. 09-_____-___ |

### AFFIDAVIT OF ANDREW FERGUSON

COMMONWEALTH OF MASSACHUSETTS ) 
                                ) ss.:
COUNTY OF MIDDLESEX              )

I, Andrew Ferguson, do depose and state as follows:

1. I am the President and Chief Executive Officer of The Ski Market Ltd., Inc., the above-captioned debtor and debtor-in-possession ("Ski Market" or the "Debtor"). In this capacity, I am familiar with Ski Market's day-to-day operations, business and financial matters.

2. I have been involved in Ski Market's operations for approximately 25 years holding the titles of Store Manager, Director of Store Operations, and President. I am also a member of the board of directors of Ski Market and have served as a director for approximately 20 years. I am also a shareholder with a 5% equity interest in Ski Market.

3. Except as otherwise indicated, all statements in this Affidavit are based upon (a) my knowledge as President and CEO of Ski Market; (b) my review of relevant documents, including Ski Market's books and records, (c) information supplied to me by other members of Ski Market's management and/or outside professionals, and (d) my opinion based on my experience and knowledge of Ski Market's operations and financial affairs.

4. As President, CEO and a member of the Board of Directors, I participated in the decision to cause Ski Market to file a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on December 29, 2009 (the "Petition Date").

5. I have reviewed Ski Market's voluntary petition, schedules, statement of financial affairs and all of the pleadings filed on or about the Petition Date (collectively, the "First Day Pleadings"). The First Day Pleadings consist of the following:

   a. Debtor's Motion for (I) Approval of Bidding Procedures and Sale Procedures and (II) Entry of an Order Authorizing (A) Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Assumption and Assignment of Certain Unexpired Leases (Request for Emergency Determination Regarding Bidding and Sale Procedures) (the "Sale Motion");

   b. Motion for Appointment of Consumer Privacy Ombudsman Pursuant to 11 U.S.C. § 332 and Request for Emergency Determination (the "Ombudsman Motion");

   c. Application for Authority to (1) Employ and (2) Pay Business Broker and Request for Emergency Determination (the "Broker Retention Application");

   d. Debtor's Motion for Entry of an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing on Use of Cash Collateral, and (IV) Granting Related Relief (Request for Emergency Determination) (the "Cash Collateral Motion");

   e. Stipulation and Interim Order (I) Authorizing the Use of Lender's Cash Collateral Under 11 U.S.C. § 363, (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363 and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001(b) (the "Cash Collateral Stipulation");

   f. Debtor's Motion for Order Authorizing Debtor to Maintain Existing Bank Accounts at South Shore Savings Bank and Request for Emergency Determination (Acknowledgement and Assent by South Shore Savings Bank) (the "Cash Management Motion"); and

   g. Debtor's Motion for Authorization to Pay Priority Pre-Petition Wages and Salaries and Request for Emergency Determination (the "Wage Motion").

6. This Affidavit supports the First Day Pleadings and the representations made therein. If called upon to testify at any hearing on the First Day Pleadings, I will testify to the facts contained in this Affidavit.

## I. HISTORY OF SKI MARKET.

7. In 1958, Ski Market began its operations as a specialty retailer of outdoor sporting goods and apparel and initially operated under the name "St. Moritz Sports." At that time and continuing to this day, Ski Market has remained a family owned and operated business.

8. Ski Market continued its sporting goods retail operations and focused on winter sporting goods in particular. In 1971, Ski Market began operating under the name "Ski Market." In the early 1990's, Ski Market was one of the first full-service retailers of snowboards and has also marketed sporting goods under the trade-name "Underground Snowboard." Until recently, Ski Market operated 15 locations in the Northeast.

9. Currently, Ski Market operates seven retail locations which feature a wide selection of skis, snowboards, bicycles, and skateboards, as well as related accessories and apparel.[1] Ski Market also offers a variety of services such as equipment rental and repairs. I believe that the "Ski Market" brand has significant value.

10. Ski Market currently employs approximately 170 full-time and part-time employees ("Employees"). I expect that current employee levels will remain substantially the same during the Chapter 11 proceedings at least through the approval and closing of the sale contemplated and described in detail in the Sale Motion (the "Sale").

11. In fiscal year 2009, which ran from April 1, 2008 – March 31, 2009, Ski Market had gross sales, net of returns, of approximately $22.5 million. To date, for fiscal year 2010 (i.e.,

---

[1] Prior to the Petition Date, as part of its cost-cutting and restructuring process, Ski Market closed all but the remaining seven locations.

April 1, 2009 through mid-December 2009), Ski Market had gross sales, net of returns, of approximately $6.9 million.

12. Notably, Ski Market's most profitable period of the year coincides with the ski season in the Northeast and, therefore, Ski Market typically operates profitably for the months of November through February. Due to, among other things, the carrying costs of significant retail space through the spring, summer and early fall months, Ski Market has operated at a loss for the past few years. The downturn in the economy and the negative impact on consumer spending during 2008 and 2009 exacerbated Ski Market's financial problems.

### A. The Sale Motion and Related Procedures, Ombudsman Motion, and Broker Retention Application.

13. In August of 2009, Ski Market engaged New England Business Exchange, Inc. ("NEBEX") to assist with the sale of Ski Market's operations as a going concern. In November of 2009, Ski Market also engaged The O'Connor Group ("TOG") as financial consultant to assist, inter alia, with the preparation of financial information required for due diligence materials.

14. Ski Market's efforts, assisted by NEBEX, have generated substantial interest from potential buyers, including both strategic buyers and liquidators. To date, however, Ski Market has been unable to obtain a stalking horse offer.

15. To attempt to maximize sale value during Ski Market's most productive season, among other reasons, Ski Market initiated these proceedings and filed the Sale Motion.

16. In the Sale Motion, Ski Market seeks to establish bidding and sale procedures that will allow Ski Market to continue marketing efforts, solicit acceptable bids, and close a sale within the next 30 – 45 days.

17. I am aware of the following creditors that have asserted or may assert secured claims against Ski Market:

    (a) South Shore Savings Bank ("SSSB"). I believe that SSSB has a first priority lien on all of Ski Market's assets and that the balance of Ski Market's obligations to SSSB as of the Petition Date totaled approximately $4,050,000.00.

    (b) The Burton Corporation ("Burton"). I believe that Burton may have a junior lien on inventory and non-inventory and that the balance of Ski Market's obligations to Burton as of the Petition Date totaled approximately $426,409.56;

    (c) Tecnica Group USA Corporation ("Tecnica"). I believe that Tecnica may have a junior lien on inventory and non-inventory and that the balance of Ski Market's obligations to Tecnica as of the Petition Date totaled approximately $437,954.54; and

    (d) Bell Sports, Inc. ("Bell Sports"). I believe that Bell Sports may have a junior lien on of Ski Market's inventory, equipment, and goods and that the balance of Ski Market's obligations to Bell Sports as of the Petition Date totaled approximately $145,016.18.

18. Therefore, as of the Petition Date, Ski Market's obligations to creditors holding secured claims total approximately $5,059,380.28 (the "Secured Debt").

19. Based on my discussions with NEBEX, my knowledge of the level of interest in Ski Market's assets, and my general industry knowledge, I believe that the value of Ski Market, either as a going concern or at liquidation, is insufficient to fully pay the obligations of SSSB.

20. Therefore, I believe that the Secured Debt owed to Tecnica, Burton, and Bell Sports may be fully unsecured.

21. As of the Petition Date, the Ski Market has trade debt of approximately $4,500,000.00 (the "Trade Debt") and rental arrears for the retail locations where Ski Market has viable leases total approximately $610,000.00 (the "Rental Arrears"). Therefore, the Secured Debt, Trade Debt and Rental Arrears total approximately $10,169,380.28 as of the Petition Date.

22.　I have consulted with NEBEX regarding the most effective and productive way to liquidate Ski Market's assets and to provide the best outcome for all creditors. NEBEX has advised me that, while there is no interest by any party to act as a stalking horse, many potential bidders have expressed an interest in participating in a bidding process to purchase either the going-concern operations or Ski Market's assets. Further, I believe that most, if not all, bidders would seek the protections of an order selling the assets "free and clear" of existing liens, claims, interests, and encumbrances.

23.　I have consulted with SSSB regarding a bankruptcy sale and advised SSSB of sale efforts to date. I believe that SSSB supports the sale efforts and the process as outlined in detail in the First Day Pleadings.

24.　I believe that the sale process set forth in the Sale Motion is the most likely process to maximize the value of Ski Market's assets. Specifically, in light of Ski Market's focus on winter sporting goods, I believe that the most profitable sale will occur during the winter months. Therefore, the bidding and sale procedures as set forth in the Sale Motion are designed to allow Ski Market to continue marketing efforts during January and close a sale by February 1, 2010.

25.　The proposed timeline is also consistent with discussions with SSSB. As discussed further below, Ski Market has negotiated with SSSB for terms of use of cash collateral and for a carve-out that will, upon closing the Sale, provide a substantial benefit to the estate and its creditors.

26.　Further, because Ski Market, with the assistance of NEBEX, has been actively soliciting buyers for a few months, the most likely potential purchasers are aware of Ski Market's intent to sell its operations and are likely prepared to assess the sale procedures and

submit a bid within the timing parameters proposed for the Sale. Notably, prior to the Petition Date, approximately 15 potential purchasers signed confidentiality agreements and obtained financial information regarding Ski Market and its operations.

27.     I also believe it is crucial that NEBEX continue to facilitate discussions with potential bidders during the Chapter 11 sale process. NEBEX has assisted with the preparation of the Due Diligence Materials (as defined in the Sale Motion) and has been in close contact with all parties most likely to bid and participate in the Sale process. Further, NEBEX has agreed to reduce its agreed-upon compensation to a level that is suitable the scope of the contemplated sale.

28.     Finally, because Ski Market's assets include a customer list that contains "personally identifiable information" Ski Market has filed the Ombudsman Motion. If no bids contemplate the acquisition of property containing "personally identifiable information", then there will be no need for the services of a consumer privacy ombudsman. I believe that it will be beneficial to have an ombudsman appointed now, however, so that if any bids include property containing "personally identifiable information" Ski Market will be able to address any issues and to comply with its timeline without delay.

29.     Based on the summary above, I believe that approval of the Sale Motion and the procedures related thereto, the Broker Retention Application, and the Ombudsman Motion are vital to Ski Market's ability to accomplish its goal of maximizing the value of its assets for the benefit of the estate and its creditors.

**B.      The Cash Collateral Motion and Cash Collateral Stipulation.**

30.     As noted above, Ski Market is obligated to SSSB for pre-petition obligations of approximately $4,050,000 (the "SSSB Obligations"). The SSSB Obligations are secured by liens on substantially all of Ski Market's assets ("SSSB Liens").

31.     With respect to the SSSB Obligations and the SSSB Liens:

  A.      I am aware of no defense, counterclaim or offset of any kind with respect to the SSSB Obligations;

  B.      As of the Petition Date, Ski Market was indebted and liable to SSSB for interest, fees, expenses, charges and other obligations incurred in connection with the SSSB Obligations;

  C.      I believe that (i) the SSSB Obligations constitute the legal, valid and binding obligations of Ski Market, enforceable in accordance with their terms (other than with respect to the stay of enforcement arising from Bankruptcy Code § 362) and (ii) no portion of the SSSB Obligations is subject to avoidance, recharacterization, reduction, disallowance, impairment, recovery or subordination under the Bankruptcy Code or applicable nonbankruptcy law;

  D.      I believe that Ski Market has no claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against SSSB or any of its respective affiliates, subsidiaries, members, agents, officers, directors, employees and attorneys; and

  E.      I believe that the liens and security interests granted to SSSB under and in connection with the SSSB Obligations are (i) valid, binding, perfected,

enforceable, first-priority liens on substantially all of Ski Market's assets, (ii) not subject to avoidance, recharacterization or subordination under the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to the Carve-Out (as defined in the Cash Collateral Stipulation).

32. Ski Market has worked diligently to negotiate cash collateral terms and a Carve-Out with SSSB so that Ski Market will have sufficient cash to fund its operations during the Chapter 11 period through the Sale closing. Based on those negotiations, Ski Market prepared and filed the Cash Collateral Motion and the Cash Collateral Stipulation, which detail cash collateral use and the scope of the Carve-Out.

33. The Sale is structured to provide the best opportunity for Ski Market to provide a benefit to Ski Market's bankruptcy estate and its creditors. At a minimum, however, due to the "administrative fund" portion of the Carve-Out, the Estate is likely to remain administratively solvent during the Chapter 11 operations. Further, the Cash Collateral Stipulation provides that, if a Sale closes, SSSB will fund an additional $25,000 into the Carve-Out from the sale proceeds.

34. The Cash Collateral Stipulation will also preserve for the Estate all causes of action, if any, available to Ski Market including, without limitation, any actions pursuant to Bankruptcy Code §§ 544, 545, 547, 548 or 550.

35. I believe it is appropriate and necessary that Ski Market grant SSSB a post-petition lien on all of Ski Market's assets to the extent of any diminution of value in SSSB's pre-petition collateral, as set forth in the Cash Collateral Stipulation.

36. I believe that it is in the best interest of the Estate that the Court allow the Cash Collateral Motion and authorize and approve the Cash Collateral Stipulation including, without limitation, the terms of the Carve-Out as set forth therein and as part of the Sale.

### C. Cash Management Motion and Wage Motion.

37. Although Ski Market intends to operate for only a short period of time, it is necessary to maintain operations in a manner that will preserve and maximize value. The Cash Management Motion and the Wage Motion are intended to allow Ski Market to operate during the Chapter 11 as close to "business-as-usual" as possible.

38. The Cash Management Motion will allow Ski Market to satisfy one of the requirements imposed by SSSB in accordance with the Cash Collateral Stipulation and also substantially reduce administrative costs and expenses that would otherwise be required to reopen banking accounts at a different banking institution.

39. The Wage Motion is necessary and appropriate and will allow Ski Market to continue its operations with the support of its employees. Absent the support of employees, damage to Ski Market's operations would be immediate and irreparable and would, further, give rise to claims against the Estate.

40. I believe that the Cash Management Motion and the Wage Motion are necessary and appropriate and in the best interest of the Estate and its creditors.

## II. CONCLUSION.

41. For the reasons set forth above, and based on all available information of which I am aware, I believe that the First Day Pleadings are necessary and appropriate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 29th day of December 2009.

_____
Andrew Ferguson