## AGENCY AGREEMENT

This Agency Agreement (the "**Agreement**") is made as of this 27 day of January 2010, by and between, Gordon Brothers Retail Partners, LLC, a Delaware limited liability company with a principal place of business located at 101 Huntington Avenue, 10th floor, Boston, MA  02199 ("**Agent**") and SKI MARKET LTD, INC., a Massachusetts corporation with a principal place of business at 466 Washington Street, Wellesley, MA 02481 ("**Merchant**").

## RECITALS

**WHEREAS,** on December 29, 2009 Merchant filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**");

**WHEREAS,** on December 29, 2009, Merchant filed a motion requesting entry of an order approving the sale of substantially all of its assets;

**WHEREAS,** Merchant desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (hereinafter defined) located or to be located in Merchant's retail store locations (collectively, the "**Stores**") identified on Exhibit 1 annexed hereto by conducting "store closing," "going out of business" or similar theme sales (the "**Sale**") at the Stores, and (b) subject to Merchant's exercise of its option pursuant to Section 15 hereof, disposing of Merchant's owned furniture, fixtures and equipment (the "**Owned FF&E**") located at the Stores and Merchant's Distribution Center (collectively, the "Closing Locations"), subject to the terms and conditions set forth herein;

**WHEREAS,** Agent is willing to serve as Merchant's exclusive agent to conduct the Sale and disposing of the Owned FF&E (subject to Merchant's exercise of its option pursuant to Section 15 hereof), in accordance with the terms and conditions of this Agreement;

**WHEREAS,** this Agreement remains subject to higher or otherwise better bids at an auction to be conducted on February 1, 2010 (the "**Auction**");

**NOW THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Merchant and Agent hereby agree as follows:

**Section 1.**

**1.1**    **Certain Defined Terms**.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Merchandise | Section 3.5 |
| Additional Taxes and Penalties | Section 8.3 |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(c) |

| | |
|---|---|
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Indemnified Parties | Section 13.1 |
| Agent's Fee | Section 3.1(b) |
| Agreement | Preamble |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Central Services Expenses | Section 4.1 |
| Closing Locations | Recitals |
| Cost Value | Section 5.3 |
| Defective Merchandise | Section 5.2(b) |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Excluded Benefits | Section 4.1 |
| Expense L/C | Section 4.2(a) |
| Expenses | Section 4.1 |
| FF&E Election | Section 15 |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 3.4 |
| Gross Rings | Section 6.3 |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty L/C | Section 3.3(b) |
| Guaranty Percentage | Section 3.1(a) |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventory Completion Date | Section 5.1 |
| Inventory Date | Section 5.1 |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Merchandise | Section 5.2(a) |
| Merchant | Preamble |
| Occupancy Expenses | Section 4.1 |
| Proceeds | Section 7.1 |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 5.3 |
| Retained Employee | Section 9.1 |
| Retention Bonuses | Section 9.4 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Order | Section 10(a) |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |

2

| | |
|---|---|
| Sharing Threshold | Section 3.1(b) |
| Store | Recitals |
| WARN Act | Section 4.1 |

**1.2** **Exhibits.** The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section | Description |
|---|---|---|
| Exhibit 1 | Recitals | Closing Locations List |
| Exhibit 3.3(a) | Section 3.3(a) | Initial Guaranty Payment Account |
| Exhibit 3.3(b) | Section 3.3(b) | Form of Guaranty L/C |
| Exhibit 4.1(a) | Section 4.1(a) | Occupancy Expense Schedule |
| Exhibit 4.2(b) | Section 4.2(b) | Form of Expense L/C |
| Exhibit 5.1 | Section 5.1 | Inventory Taking Instructions |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |

**1.3** **Currency.** Unless otherwise specified, all references to monetary amounts refer to United States dollars.

### Section 2.    Appointment of Agent; Bankruptcy Court Approval.

**2.1** Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of the Owned FF&E, at Merchant's election, in accordance with the terms and conditions of this Agreement. Merchant's obligations hereunder are expressly subject to the issuance of the Sale Order.

**2.2** Except for incurring Expenses in connection with the Sale and as otherwise specifically provided in this Agreement, Agent shall have no authority to enter into any contract, agreement or other arrangement or take any other action, by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

### Section 3.    Guaranteed Amount and Other Payments.

**3.1** **Payments to Merchant.**

(a) As a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive from Agent the sum of forty-six percent (46%) (the "**Guaranty Percentage**") of the aggregate Cost Value of the Merchandise included in the Sale (the "**Guaranteed Amount**").

(b) If the Proceeds exceed the sum of:  (x) the Guaranteed Amount, (y) Expenses of the Sale, and (z) five percent (5%) of the aggregate Cost Value of the Merchandise (the "**Agent's Fee**") (the sum of (x), (y) and (z), the "**Sharing Threshold**"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant and fifty percent (50%) to Agent.  All amounts, if any, to be received by Merchant

3

from Agent in excess of the Sharing Threshold shall be referred to as the "**Recovery Amount**". Agent shall tender payment of an amount equal to the current unpaid balance of the Recovery Amount (*i.e.,* net of any portion of the Recovery Amount previously paid to Merchant) as part of the weekly reconciliation conducted pursuant to Section 8.7 hereof.

(c)     Agent shall pay to Merchant the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.  The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, and (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement).

(d)     The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise being not less than $2,300,000 (the "**Merchandise Threshold**").  If the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(d) attached hereto.

### 3.2     Payments to Agent and Remaining Merchandise.

(a)     As its compensation for services rendered to Merchant, Agent shall receive the Agent's Fee and all remaining Proceeds of the Sale after payment of the Guaranteed Amount, the Recovery Amount, if any, and all Expenses.

(b)     All Merchandise remaining, if any, as of the Sale Termination Date (the "**Remaining Merchandise**") shall become the property of Agent, free and clear of all liens, claims and encumbrances, provided, however, that Agent shall use its best efforts to sell all of the Merchandise during the Sale.  Any proceeds received from the sale of any Remaining Merchandise shall be deemed Proceeds under this Agreement, provided that, for the purposes of tracking Proceeds to be received by Agent from the subsequent disposition of the Remaining Merchandise, at the conclusion of the Sale, Merchant and Agent shall jointly conduct a physical inventory taking of the Remaining Merchandise as an Expense of the Sale, to calculate the Aggregate Cost Value of such Remaining Merchandise (the "**Aggregate Cost Value of Remaining Merchandise**").  Until such time as Agent has disposed of all of the Remaining Merchandise, Agent shall provide Merchant with a weekly written report of the status of such dispositions; provided, however, unless otherwise agreed between Merchant and Agent, Agent shall dispose of all Remaining Merchandise within sixty (60) days after the Sale Termination Date.  In the event Agent proposes to sell any remaining Merchandise in bulk, or to Agent or to an affiliate of Agent, any such sale shall be subject to the prior written approval of Merchant, which approval shall not be unreasonably withheld.

### 3.3     Time of Payments and Control of Proceeds.

(a)     On the first business day following the Sale Commencement Date, Agent shall pay Merchant seventy percent (70%]) of the estimated Guaranteed Amount (the "**Initial Guaranty Payment**"), calculated based upon the estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records on the date

immediately preceding the Sale Commencement Date (the "**Estimated Guaranteed Amount**") by wire transfer in immediately available funds to the account designated in Exhibit 3.3(a) attached hereto.  Within two (2) business days after the Inventory Taking Service issues the final certified report of the aggregate Cost Value of the Merchandise, as verified by Agent and Merchant (the "**Final Inventory Report**"), Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "**Adjustment Amount**") by which the actual Guaranteed Amount exceeds or is less than the Initial Guaranty Payment.  The banks and companies identified in section 11.1 (c) have consented to Merchant's obligations expressed in the preceding sentence and will cooperate (as applicable and needed) to allow Merchant to fulfill any such obligations.  Agent's failure to pay the balance of the Guaranteed Amount, if any, shall constitute a material breach of this Agreement and thereupon entitle Merchant to draw upon the Guaranty L/C to the extent of such remaining balance.  The Inventory Taking shall be reconciled within seven (7) days after its completion (and Agent and Merchant shall use their reasonable best efforts to accomplish such reconciliation within such seven (7) day period).  In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.4(b) hereof.

(b)    To secure payment of the balance of any unpaid portion of the Guaranteed Amount, the Recovery Amount, and all other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable standby letter of credit in the original face amount of $317,500, naming Merchant as beneficiary, substantially in the form of Exhibit 3.3(b) attached hereto (the "**Guaranty L/C**").  The Guaranty L/C shall be delivered to Merchant no later than five (5) days following the Sale Commencement Date, shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant.  The Guaranty L/C shall expire no earlier than sixty (60) days after the Sale Termination Date.  At least thirty (30) days prior to the initial or any subsequent expiry date, unless the parties shall have mutually agreed in writing that they have completed the Final Reconciliation, Agent shall obtain and deliver to Merchant an amendment to the Guaranty L/C solely extending (or further extending, as the case may be) the expiry date by at least sixty (60) days; provided, that, in the event that at the scheduled expiration date of the Guaranty L/C there remains any unresolved dispute as to the payment or the amount of the Guaranteed Amount, the Recovery Amount, the Expenses, or any other amount due from Agent to Merchant, Merchant may, in its discretion, exercise the right to cause Agent to have the expiration date of the Guaranty L/C extended for ninety (90) day intervals (or such other duration as Merchant and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder paid to Merchant.  Agent's failure to deliver any required amendment to the Guaranty L/C extending its expiry dates shall constitute a material breach of this Agreement, and thereupon all amounts hereunder shall become immediately due and payable, and in addition to all other remedies available to Merchant hereunder, Merchant shall be permitted to draw the full face amount of the Guaranty L/C in payment of all amounts owed and shall hold the balance of the amount drawn under the Guaranty L/C as security for amounts that may become due and payable to Merchant hereunder. In the event that Agent, after receipt of five (5) days' notice (which notice shall not be required if Agent or any member of Agent shall be a debtor under the Bankruptcy Code), fails to pay the Guaranteed Amount, or portion thereof, or other obligations hereunder when due, Merchant may draw on the Guaranty L/C in an amount equal to the unpaid past due amount of the Guaranteed Amount or other obligations hereunder.  Merchant and Agent agree that after payment of the

5

unpaid portion of the Guaranteed Amount pursuant to Section 3.3(a), the face amount of the Guaranty L/C shall be reduced in an amount(s) to be agreed upon by Merchant and Agent.

(c)     Within twenty (20) days after the Sale Commencement Date, Agent shall establish its own bank accounts, dedicated solely for the deposit of Proceeds and the disbursement of amounts payable by Agent hereunder (the "**Agency Accounts**").  Merchant shall, promptly upon Agent's request, execute and deliver all necessary documents to open and maintain the Agency Accounts.  Alternatively, at Agent's request, Agent may continue to use Merchant's existing bank accounts as the Agency Accounts, subject to and conditioned upon mutually agreed terms and conditions.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided however, upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts and/or Designated Merchant Accounts, whether received during or after the Sale Term.  Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.  During the period between the Sale Commencement Date and the date Agent establishes the Agency Accounts, all Proceeds of the Sale (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into Merchant's existing accounts designated for the Stores (the "**Designated Merchant Accounts**").  Commencing on the one (1) week anniversary following the payment of the Initial Guaranty Payment and the posting of the Guaranty L/C and the Expense L/C, and on a weekly basis thereafter (or as soon thereafter as is practicable), assuming no default by Agent hereunder, Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited in the Designated Merchant Accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date).

3.4     **Final Reconciliation.**  (a)  Within ten (10) business days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including, without limitation, a summary of Proceeds, taxes, Expenses, and any other accountings required hereunder (the "**Final Reconciliation**").  Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent.  Any disputed amount(s) shall be paid into escrow with a mutually acceptable escrow agent until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.4(b) hereof.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, taxes and Expenses to review and audit such records.

(b)     In the event that there is any dispute with respect to the Final Reconciliation, such dispute shall be promptly submitted to the Bankruptcy Court for a determination.

### 3.5     Additional Merchandise.

(a)     Agent shall be entitled, at its expense, to include in the Sale, additional merchandise which is of no lesser quality than, and which is of similar type to, the Merchandise presently located in the Stores ("**Additional Merchandise**").

(b)     At all times and for all purposes, the Additional Merchandise and its proceeds shall be the exclusive property of Agent.  The transactions relating to the Additional Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  The Additional Merchandise shall be at all times subject to the control of Agent.  If requested by Agent, Merchant shall, at Agent's expense, insure the Additional Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)     In order to distinguish the Additional Merchandise from the Merchandise located in the Stores, Agent shall ascribe a "dummy" SKU to such item of Additional Merchandise, which shall enable Merchant and Agent to distinguish the sales of the Additional Merchandise from the sale of the Merchandise presently included in the Sale.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Merchandise has been included in the Sale, as well as insuring that distinctive tags and/or other identifying markings are placed on the subject merchandise to distinguish such goods from Merchandise.

(d)     In consideration for the right to include Additional Merchandise in the Sale, Agent shall pay to Merchant an amount equal to five percent (5%) of Agent's aggregate net proceeds from the sale of Additional Merchandise.  Such payment shall be tendered by Agent to Merchant in weekly installments as part of the weekly reconciliation pursuant to Section 8.7 hereof.

### Section 4.     Expenses of the Sale.

**4.1     Expenses.**  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale, which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "**Expenses**" shall mean all Store-level operating expenses of the Sale which arise during the Sale Term at the Stores, limited to the following (unless otherwise specified herein):

(a)     Occupancy Expenses for each Store, on a per location and per diem basis, in an aggregate amount equal to the per diem amounts set forth on Exhibit 4.1(a) annexed hereto;

(b)     All of Merchant's actual, out-of-pocket payroll expenses for all Retained Employees used in conducting the Sale, for the actual days worked (or in the case of hourly employees, the hours worked) in connection with the Sale;

(c)     Any amounts payable by Merchant to the Retained Employees used in the Sale (other than those amounts payable pursuant to Section 4.1(b) hereof) with respect to (i) benefits (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits, pension and 401-K benefits, but excluding Excluded Benefits),

and (ii) vacation days and or vacation pay, sick days or sick leave, holiday pay, maternity leave or other leaves of absence, ERISA coverage and similar contributions (other than 401(k) contributions), in an amount not to exceed 15% of base payroll for each Retained Employee ("**Benefits Cap**").

(d)    In-Store signs and banners and other advertising media which are produced for the Sale;

(e)    Promotional costs, including, without limitation, advertising, and direct mail, and any advertising medium produced for the Sale;

(f)    The reasonable costs and expenses of obtaining additional supplies as may be required by Agent to conduct the Sale;

(g)    Telephone charges, leased line charges, postage/overnight or delivery/courier charges, and water related to the Stores, as set forth in and limited by Exhibit 4.1 (a);

(h)    Credit card and bank card fees (including processing fees), chargebacks and discounts, and returned check fees;

(i)    Any costs and fees associated with the Agency Accounts and the Designated Merchant Accounts;

(j)    Costs of moving, transferring or consolidating Merchandise between the Stores;

(k)    All of Merchant's casualty, property, and general liability insurance premiums attributable to the Stores as set forth in and limited by Exhibit 4.1 (a);

(l)    Any of Merchant's deductibles for its casualty, property, and general liability insurance attributable to the Stores as set forth in and limited by Exhibit 4.1 (a);

(m)    Trash removal and ordinary course third party cleanings, as well as any housekeeping and cleaning expenses for the Stores as set forth in and limited by Exhibit 4.1 (a);

(n)    Store security and building alarm services, to the extent not included as an Occupancy Expense;

(o)    Fifty percent (50%) of the cost (including associated labor) of the Inventory Taking by the Inventory Taking Service;

(p)    Armored car fees;

(q)    All of Merchant's actual, out-of-pocket Central Services Expenses in an amount not to exceed $250 per week per Store during the Sale Term;

(r)      Retention Bonuses for Retained Employees as provided for in Section 9.4 hereof;

(s)      Agent's Guaranty L/C and Expenses L/C fees, cost of capital and legal fees incident to this transaction, not to exceed in the aggregate $15,000; and

(t)      Agents' fees, deferred compensation and travel expenses paid for its consultants.

"Expenses" shall not include:  (i) Central Service Expenses in excess of the amounts provided for in Section 4.1(q); (ii) Excluded Benefits; (iii) Occupancy Expenses in excess of the amounts provided for in Section 4.1(a) hereof; (iv) any costs or expenses of any kind or nature associated with, arising under and/or related to the Worker Adjustment Retraining Notification Act (the "**WARN Act**"); and any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term.

For avoidance of doubt, to the extent any Expense is defined or categorized more than once, then such Expense shall be paid only once, to avoid any double counting of Expenses and to the extent such Expense is listed in Exhibit 4.1 (a) the amount set forth therein shall control.

As used herein, the following terms have the following respective meanings:

"**Central Services Expenses**" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, MIS services, payroll and accounting, inventory processing and handling and data processing and reporting.

"**Excluded Benefits**" means employee benefits in excess of the Benefits Cap percentage limitation provided in Section 4.1(c) above.

"**Occupancy Expenses**" means those categories of Expenses identified in Exhibit 4.1 (a) and outlined by sections 4.1 a through 4.1 t.

## 4.2    **Payment of Expenses; Security.**

(a)      All Expenses incurred by Merchant during each week of the Sale (*i.e.*, Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7, based upon invoices and other documentation reasonably satisfactory to Agent; except with respect to Occupancy Expenses, which shall be funded weekly, in advance, by Agent during the Sale Term. To secure Agent's obligations to pay Expenses, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit (substantially in the form of Exhibit 4.2(a) (the "**Expenses L/C**") in an original face amount equal to four (4) weeks' estimated Expenses, naming Merchant as beneficiary.  The Expense L/C shall be delivered to Merchant no later than five (5) days after the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant.  Provided that all Expenses have been paid when due by Agent, Merchant and Agent agree that at the point where there is less than one (1) week remaining in the Sale Term, the face amount of the Expense L/C shall be reduced in

9

amount(s) to be agreed upon in writing by Merchant and Agent; provided, however, the face amount of the Expense L/C shall not be reduced to an amount less than $50,000; provided, further, however, that in the event that at the scheduled expiration date of the Expenses L/C there remains any unresolved dispute as to the payment or the amount of Expenses, or any other amount due from Agent to Merchant, Merchant may, in its discretion, exercise the right to cause Agent to have the expiration date of the Expenses L/C extended for ninety (90) day intervals (or such other duration as Merchant and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder paid to Merchant.

(b)     In the event that Agent fails to pay any Expense(s) when due, or within three (3) business days after Merchant notifies Agent that any Expense(s) is/are unpaid and past due, or in the event the Expense L/C will expire within five (5) business days and certain Expenses remain unpaid, Merchant shall be entitled to draw on the Expense L/C to fund such unpaid amount(s). The Expense L/C shall expire not earlier than the date that is sixty (60) days after the Sale Termination Date. Unless the parties shall have mutually agreed that all Expenses due and payable have been accounted for and paid, then, at least thirty (30) days prior to the initial or any subsequent expiry date, Agent shall obtain and deliver to Merchant an amendment to the Expense L/C solely extending (or further extending, as the case may be) the expiry date by at least sixty (60) days. Agent's failure to deliver any required amendment to the Expense L/C extending its expiry date shall constitute a material breach of this Agreement, and thereupon all amounts hereunder shall become immediately due and payable, and in addition to all other remedies available to Merchant hereunder, Merchant shall be permitted to draw under the Expense L/C in payment of amounts owed and shall hold the balance of the amount drawn under the Expense L/C as security for amounts that may become due and payable to Merchant hereunder.

### Section 5.     Inventory Valuation; Merchandise.

**5.1     Inventory Taking.** (a) As soon as practicable following the Sale Commencement Date, but in no event later than one (1) day after the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU and retail physical inventory of the Merchandise located in the Stores (the "**Inventory Taking**"), which Inventory Taking shall be completed in all of the Stores no later seven (7) days after the Sale Commencement Date (the "**Inventory Completion Date**", and the date of the Inventory Taking at each location being the "**Inventory Date**" for each such location). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "**Inventory Taking Service**") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Exhibit 5.1, which shall be initialed on each page by a representative of Merchant and Agent prior to dissemination to the Stores (the "**Inventory Taking Instructions**"). As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. Except for the fees and expenses payable to the Inventory Taking Service, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Merchant and Agent shall each have representatives present during the Inventory Taking, and each, along with a representative of the official committee of unsecured creditors, shall have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Stores, the applicable Closing Location shall be closed to

the public and no sales or other transactions shall be conducted. Merchant and Agent agree to cooperate with each other to conduct the Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.

**5.2** **Merchandise Subject to this Agreement.** (a) For purposes of this Agreement, including, without limitation, the calculation of the Guaranteed Amount and the Recovery Amount, if any, "**Merchandise**" shall mean: all finished goods inventory owned by Merchant located in the Stores on the Sale Commencement Date (including, but not limited to, (A) Defective Merchandise and (B) Merchandise subject to Gross Rings). Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, Licensees or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furnishings, trade fixtures furniture and equipment and improvements to real property which are located in the Closing Locations.

(b)    As used herein, the following term shall have the respective meanings set forth below:

"**Defective Merchandise**" means any goods agreed upon by Merchant's representative and Agent's representative during the Inventory Taking as defective or otherwise not saleable in the ordinary course of business as first quality goods, including any used Merchandise and Merchandise for rent or lease, where Merchant and Agent mutually and reasonably agree as to the Retail Price and Cost Value of such Defective Merchandise. Defective Merchandise shall not include display merchandise per se or goods which have minor wear, soiling, stains, dents, tears, or scratches that do not effect their salability as first quality goods in the ordinary course of business or missing parts that may be reasonably substituted by Merchant that do not affect the salability of the goods as first quality, which goods shall constitute "Merchandise" hereunder. If Merchant and Agent cannot reasonably agree on the appropriate Retail Price and Cost Value to be applied to an item that would otherwise constitute Defective Merchandise in a Store, then the item will become Merchant's responsibility and will be excluded from the Merchandise and the Sale in such Store.

**5.3** **Valuation.** (a) For purposes of this Agreement, "**Cost Value**" means, with respect to each item of Merchandise, the actual cost for such item of Merchandise as reflected in Merchant's master cost file provided by Merchant as of January 24, 2010 called "OH__by__style 1.24.10.xls", inclusive of actual freight cost.

(b)    For purposes of this Agreement, "**Retail Price**" means, with respect to each item of Merchandise, the lower of the lowest ticketed price shelf price, or SKU price and with respect to Defective Merchandise, as forth in Section 5.2 hereof, (the "**Base Retail Price**"); provided, however, Excluded Pricing Adjustments shall not be taken into account in determining the Base Retail Price. In the event the Base Retail Price of an item is below its Cost Value, then its Base Retail Price shall be considered to be its Cost Value. The Retail Price of any item of Merchandise shall be determined as provided for by this Agreement and in accordance with the Inventory Taking Instructions set forth in Exhibit 5.1. For the purposes of this Agreement, "**Excluded Pricing Adjustments**" means the following discounts or price adjustments offered by Merchant: (i) point-of-sale discounts or similar adjustments, regardless of duration; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit

11

purchase discounts; (v) coupons, catalog, website, or circular prices, "buy, one" get one type discount promotions; and (vi) customer savings pass discounts or bounce back coupons, or discounts for future purchases based on dollar value of past purchases, or similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

(c)    In the event of a conflict between this Agreement and the Inventory Taking Instructions, the terms of this Agreement shall control.  If an item of Merchandise has more than one ticketed price, or if multiple items of the same SKU are ticketed, at different prices, or have a different SKU or PLU price, the lowest ticketed, marked, SKU or PLU price on any such item shall prevail for such item or for all such items within the same SKU (as the case may be, the "**Lowest Location Price**"), as the case may be, that are located within the same Store, unless it is reasonably determined by Merchant and Agent that the applicable Lowest Location Price was mismarked or such item was priced because it was damaged or marked as "as is", in which case the higher price shall control.  No adjustment to Retail Price shall be made with respect to different ticketed price, marked price, SKU or PLU prices for items located in different Stores.

**5.4**    **Excluded Goods.**  Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove such goods from the Stores prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable.

**Section 6.**    **Sale Term.**

**6.1**    **Term.**  The Sale shall commence at the Stores on the first day after entry of the Sale Order (the "**Sale Commencement Date**").  Agent shall complete the Sale at each Store, and shall vacate each of the Stores in favor of Merchant or its representative or assignee on or before April 30, 2010 (the "**Sale Termination Date**").  The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "**Sale Term**".  The Sale Termination Date may be (a) extended by mutual written agreement of Agent and Merchant; or (b) accelerated at any Store by Agent, in which case Agent shall provide Merchant with not less than seven (7) days advance written notice of any such planned accelerated Sale Termination Date.

**6.2**    **Vacating the Stores.**  Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Store (as to each such location, the "**Vacate Date**").  By the Vacate Date, Agent shall surrender and deliver the keys to the Stores to Merchant or its representatives or assignee, remove all Remaining Merchandise and leave the applicable Closing Location in "broom clean" condition (ordinary wear and tear excepted).  Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Closing Location shall continue until the later of (a) the applicable Vacate Date for such Closing Location, or (b) the 15th day of the calendar month in which the Vacate Date for such Closing Location occurs.  On or before the applicable Vacate Date, Agent shall remove any and all banners and/or signage used by it during the Sale Term and if Merchant has exercised the FF&E Election, Agent shall remove all Owned FF&E from the Closing Locations subject to Section 15 hereof.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any Closing Location during the Sale Term, including without limitation, damage caused by installation or

12

removal of banners and/or signage and/or removal of Owned FF&E, ordinary wear and tear
excepted, and shall indemnify and hold Merchant and its officers, directors, employees, agents
and representatives harmless from and against all claims, demands, penalties, losses, liability or
damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly
or indirectly against Merchant resulting from, or related to (including acts or omissions of
persons or entities affiliated with or acting on behalf of Agent) any such damage or Agent's
breach or failure to leave a Closing Location in "broom clean condition."

**6.3**     **Gross Rings.**  In the event that the Sale commences at any Store prior to the
completion of the Inventory Taking at such Store, then for the period from the Sale
Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly
keep (i) a strict count of gross register receipts less applicable Sales Taxes ("**Gross Rings**"), and
(ii) cash reports of sales within such Stores.  Register receipts shall show for each item sold the
Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in
connection with such Sale.  All such records and reports shall be made available to Agent and
Merchant during regular business hours upon reasonable notice.  Agent shall pay that portion of
the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the
basis of 1.0% of sales (without taking into account any point of sale discounts or point of sale
markdowns) during the Gross Rings period.

### Section 7.     Sale Proceeds.

**7.1**     **Proceeds.**  For purposes of this Agreement, "**Proceeds**" shall mean the aggregate
of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and
service revenue, exclusive of Sales Taxes, and specifically excluding (i) proceeds from
Merchant's sale of merchandise prior to the Sale Commencement Date, such as special order
goods, and (ii) collections of accounts receivable at the Store level, if any, and (b) all proceeds
(net of deductibles) of Merchant's insurance for loss or damage to Merchandise or loss of cash
arising from events occurring during the Sale Term.  Proceeds shall also include any and all
proceeds received by Agent from the disposition, in a commercially reasonable manner, of
Remaining Merchandise at the end of the Sale whether through salvage, bulk sale or otherwise.

**7.2**     **Credit Card Proceeds.**  To the extent Merchant is able to practicably maintain
credit card systems and servicing arrangements, Agent shall be allowed to use such credit card
systems and servicing arrangements (including Merchant's credit card terminals and processor(s)
and credit card processor coding) during the course of the Sale including Merchant's
identification numbers; and, provided further, that Agent shall not accept Merchant's proprietary
credit card (if any).  Merchant shall process credit card transactions applying customary practices
and procedures to the extent practicable.  At Agent's request, Merchant shall cooperate with
Agent to establish merchant identification numbers under Agent's name to enable Agent to
process all credit card sales for Agent's account.  Merchant shall deposit the net settlement
received from any credit card sales receipts into the Designated Deposit Accounts until Agent
opens the Agency Accounts, at which time any credit card sales receipts shall be deposited into
the Agency Accounts.  Merchant shall prepare a weekly reconciliation of the amounts deposited
with respect to the sales of Merchandise by credit card plus Sales Taxes less credit card and bank
card fees, chargebacks and service charge adjustments, returns allowances and customer credits.
Merchant shall not be responsible for paying and Agent shall pay as an Expense hereunder, all

13

credit card fee charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

**7.3     Petty Cash.**  In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date and shall reimburse Merchant on a dollar for dollar basis therefor.  Agent also shall purchase, on a dollar for dollar basis, all cash located in Merchant's bank accounts which are used by Agent hereunder, which shall be determined, and paid for, as of the Sale Commencement Date.

### Section 8.     Conduct of the Sale.

**8.1     Rights of Agent.**  Subject to the Sale Order, Agent shall be permitted to conduct the Sale as a "store closing," "going out of business" or other similar themed sale in the Stores throughout the Sale Term in a manner consistent with the sale guidelines annexed hereto as Exhibit 8.1 (the "**Sale Guidelines**") whether by in-store or media advertising or promotional materials, and to provide services as Merchant historically has provided in selling and servicing inventory.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its discretion, shall have the right:

(a)     to establish Sale prices and Store hours which are consistent with the terms of applicable leases, mortgages or other occupancy agreements, and local laws or regulations, including, without limitation, Sunday closing laws to the extent provided in the Sale Order;

(b)     to use without charge (except to the extent provided otherwise herein) during the Sale Term all Owned FF&E, bank accounts, computer hardware and software, existing supplies located at the Closing Location, intangible assets (including Merchant's name, logo and tax identification numbers), Stores keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, assets used in Merchant's providing services, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended.

(c)     to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house, at no cost to Agent, subject to Agent's payment of Central Service Expenses in accordance with Section 4.1;

(d)     to establish and implement advertising, signage (including banners), sign walkers, and promotion programs consistent with a "store closing," "going out of business" or other similar theme sale, to the extent consistent with the Sale Order and the Sale Guidelines (including, without limitation, by means of media advertising, banners, A-frame, and similar signage);

(e)     to transfer Merchandise between Stores; provided however the Inventory Taking Instructions shall incorporate a procedure to ensure that all Merchandise that is in transit

between and among the Stores shall be properly accounted for and included in the Inventory Taking; and

        (f)    to supplement the Merchandise at the Stores with Additional Merchandise in accordance with Section 3.5 hereof.

**8.2**    <u>Terms of Sales to Customers; Law Compliance</u>.

        (a)    Subject to Agent's compliance with applicable law, all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards and, in Agent's discretion, personal checks, <u>provided</u>, <u>however</u>, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.  Agent shall not accept any coupons or other promotional savings passes issued by Merchant prior to the Sale Commencement Date.

        (b)    Unless otherwise directed in writing by Merchant, Agent shall not accept Merchant's gift certificates, gift cards, merchandise credits, and merchandise certificates issued by Merchant prior to the Sale Commencement Date.  Should Merchant so instruct Agent, Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7.

        (c)    Except as may otherwise be provided in the Sale Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, and Merchandise pricing.  If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.

**8.3**    <u>Sales Taxes</u>.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "**<u>Sales Taxes</u>**") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, and deposited into Merchant's existing accounts, trust accounts or other accounts, as designated by Merchant.  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary herein, in the event that Agent uses any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and the like payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale were less than those mandated by applicable law (any such additional Sales Taxes and other amounts are collectively referred to herein as "**<u>Additional Taxes and Penalties</u>**").  Agent will indemnify and hold Merchant harmless from any and all costs, claims or

15

expenses related to Additional Taxes and Penalties.  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Provided Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

**8.4    Supplies.**  Agent shall have the right to use all existing supplies necessary to conduct the Sale (*e.g.*, bags, twine,) including supplies (e.g. screws, components) for service customarily provided by Merchant in the sale of inventory, but not gift certificates, rain checks, merchandise credits or the like, located at the Stores at no charge to Agent.  In the event that additional supplies are required in any of the Stores during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that Merchant shall assist Agent in obtaining supplies from Merchant's vendors at Merchant's cost.

**8.5    Returns of Merchandise.**

(a)    Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date; provided that (i) such item was purchased within **thirty** (30) days prior to the Sale Commencement Date; (ii) the customer has the original register receipt; (iii) such return is not being made in contemplation of such customer repurchasing the item at the sale price being offered by Agent, and (iv) such return complies with Merchant's return policy existing immediately prior to the Sale Commencement Date ("**Returned Merchandise**").  Merchant shall reimburse Agent in cash for the amount of any cash refund given to any customer in respect of Returned Merchandise.  To the extent that Returned Merchandise is first-quality merchandise, it shall be included in Merchandise, and for purposes of calculation of the Guaranteed Amount, shall be valued at the Cost Value applicable to such item.  The Retail Price and Cost Value of Returned Merchandise that is Defective Merchandise shall be determined pursuant to Section 5.2.  Subject to Merchant's reimbursement to Agent of the amount of cash refund granted for any Returned Merchandise, the aggregate Cost Value shall be increased by the Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5), and the Guaranteed Amount shall be adjusted accordingly.  Such adjustment of the Guaranteed Amount shall be calculated by giving effect (e.g. multiplying the Cost Value) by the inverse of the then prevailing discount on Merchandise at the time of the return. Any Returned Merchandise that is not included in Merchandise shall be disposed of by Agent at Merchant's expense in accordance with instructions received from Merchant or, in the absence of such instructions, left at the Stores for Agent at the end of the Sale Term.  Any

16

increases in the Guaranteed Amount and any reimbursements due to Agent as a result of
Returned Merchandise shall be accounted for and paid by Agent and/or Merchant, as applicable,
immediately following the weekly Store Closing Sale reconciliation pursuant to Section 8.7
hereof

8.6    **Merchant's Right of Access.**  Merchant shall have the right to be present in the
Closing Locations at any time, provided that Merchant's presence does not unreasonably disrupt
the conduct of the Sale.  Merchant shall also have a right of access to the Closing Locations at
any time in the event of an emergency situation, and shall promptly notify Agent of such
emergency.

8.7    **Weekly Sale Reconciliation.**  On each Wednesday during the Sale Term,
commencing on the second Wednesday after the Sale Commencement Date, Agent and
Merchant shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items
as either party shall reasonably request, in each case for the prior week or partial week (*i.e.*,
Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent.

## Section 9.    Employee Matters.

9.1    **Merchant's Employees.**  Subject to the terms of any employment contract, and
consistent with Merchant's past practices, policies and procedures relating to the employment of
its employees, Agent may use Merchant's Store- level employees in the conduct of the Sale to
the extent Agent, in consultation with Merchant, deems expedient, and Agent, in consultation
with Merchant, may select and schedule the number and type of Merchant's employees required
for the Sale.  Agent shall identify in writing to Merchant any such employees to be used in
connection with the Sale (each such employee, a "**Retained Employee**") prior to the Sale
Commencement Date.  In consultation with Merchant, Agent shall identify any employees who
will not be used in connection with the Sale prior to the Sale Commencement Date.  Employees
will be selected by seniority and status where possible.  Agent acknowledges and agrees that the
selection and scheduling of Retained Employees and the decision to cease using Retained
Employees in connection with the Sale shall be made with due regard to Merchant's desire to
minimize severance, termination and any WARN Act costs to Merchant, and shall be made so as
not to interrupt any statutory working notice.  Retained Employees shall at all times remain
employees of Merchant, and shall not be considered or deemed to be employees of Agent.
Merchant and Agent agree that, except to the extent that wages, vacation pay and benefits of
Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and
none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption
by Agent of any of Merchant's obligations relating to any of Merchant's employees including,
without limitation, Excluded Benefits; nor shall Agent become liable under employment
agreements or be deemed a joint or successor employer with respect to such employees.
Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase
the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its
employees in anticipation of the Sale or prior to the Sale Termination Date.  It is understood and
agreed that Agent's on-site supervisors shall not be employees of Merchant under any
circumstances.

**9.2** **Termination of Employees.** Consistent with Merchant's past practices, policies and procedures related to the employment of its employees, Agent may, in its discretion, stop using any Retained Employee at any time during the Sale.  In the event of any Retained Employee is no longer needed, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable.  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).  Notwithstanding any other provision hereof, Agent will indemnify and hold Merchant harmless with respect to any claims by Retained Employees arising from Agent's unlawful treatment of such Retained Employees.

**9.3** **Payroll Matters.** During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation, employment and unemployment insurance, and benefits for all Retained Employees in accordance with its usual and customary procedures.  Any additional personnel hired by Agent for the Sale shall not be deemed to be employees of Merchant, nor shall Merchant be obligated to process the payroll therefor or offer benefits to said additional personnel.

**9.4** **Employee Retention Bonuses.** Agent may pay, as an Expense, retention bonuses ("**Retention Bonuses**") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of **ten percent (10%)** of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause".  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its reasonable discretion, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within five (5) days after the Sale Commencement Date.  Agent shall not utilize the Retention Bonus as a mechanism to incentivize Retained Employees to act contrary to Merchant's best interests.  Agent will indemnify and hold Merchant harmless with respect to any claims by Retained Employees for or relating to any unpaid Retention Bonus.

**Section 10.** **Conditions Precedent.** The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)    On or before **February 5, 2010**, the Bankruptcy Court shall have entered an order (the "**Sale Order**"), providing, in a form reasonably satisfactory to Merchant and Agent, among other things, that:

(i)    the terms of this Agreement (and each of the transactions contemplated hereby) are approved;

(ii)    Agent shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims and encumbrances thereon (collectively, "**Liens**"), with any presently

18

existing Liens encumbering all or any portion of the Merchandise or the Proceeds attaching only to the proceeds thereof to which Merchant is entitled under this Agreement;

(iii)   Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Merchant as designated and provided for in this Agreement for the purpose of conducting the Sale, free of any interference from any entity or person;

(iv)   Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "store closing," going out of business," or other similarly themed sale without further consent of any person (other than Merchant as provided for herein), in accordance with the terms and conditions of this Agreement and the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales and/or going out of business sales, other than those designed to protect public health and safety;

(v)   Subject to Section 8.1(b) hereof, Agent shall be granted a limited license and right to use until the Sale Termination Date, Merchant's trade names and logos, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement;

(vi)   authorizing the sale of Additional Merchandise as provided for herein and in the Sale Guidelines; and

(vii)   granting Agent, subject to Agent's obligations to pay the Guaranteed Amount, the Recovery Amount, Expenses, and all other payments required from Agent under this Agreement, a valid, duly perfected first priority lien and security interest in the Merchandise and any Proceeds to which Agent is entitled in accordance with the terms of this Agreement.

(b)   The Sale Order shall not have been vacated or stayed, or subject to any appeal.

### Section 11.   Representations, Warranties and Covenants.

**11.1   Merchant's Representations, Warranties and Covenants.**  Subject to entry of the Sale Order, Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)   Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts; (ii) except to the extent otherwise provided in the Bankruptcy Code, has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Closing Locations are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not

19

reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the issuance and entry of the Sale Order, and to the best of Merchant's knowledge, (i) Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "**Agency Documents**") and to perform fully its obligations thereunder; (ii) no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale; (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms; (iv) no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (v) other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)    Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise. Merchant shall not create, incur, assume, or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, except for such pre-existing prepetition security interests and liens and the postpetition security interests and liens of South Shore Savings Bank; The Burton Corporation; Tecnica Group USA Corporation; and Bell Sports, Inc.

(d)    Merchant has maintained its pricing and cost files in the ordinary course of business consistent with historic practices, and (i) prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein; and (ii) cost for inventory and goods has been and shall be recorded in the cost files as historically and customarily recorded. The "cost factor" (defined as Cost Value to Base Retail Price) shall be no greater than 55%. Exhibit 11.1(d) sets forth the adjustments to the extent the "cost factor" is greater than 55%.

(e)    Merchant has not, since **January 1, 2010**, and shall not up to the Sale Commencement Date, mark up or raise the price of any items of Merchandise, or remove or alter any tickets or any indicia of clearance merchandise, except in the ordinary course of business consistent with historic practices and except for the effects of the termination of promotional events. Agent acknowledges that from time to time Merchant has adjusted prices charged to the public for goods, including the removal of indicia of clearance, buy one get one, and other promotional activities and the prices charged to the public for certain goods.

(f)     Merchant shall ticket or mark all items of inventory received at the Stores prior to and following the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(g)     Merchant has not and shall not purchase, or transfer to or from the Stores, any Merchandise, or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.  The Merchandise at the Sale Commencement Date shall be substantially the same as to mix, quantity and categories as identified in file "Current_Dept_Inventory_-_YTD 1.24.10 with OH Quantities and Original Retail.xls" dated January 24, 2010_except for sales in the ordinary course between January 24, 2010 and the Sale Commencement Date.

(h)     Merchant is not a party to any collective bargaining agreements covering any Retained Employees.

**11.2   Agent's Representations, Warranties and Covenants.**  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent:  (i) is a corporation or limited liability company, as the case may be, duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Agent and, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     Except as may be otherwise provided in the Sale Order, the Sale shall be conducted in compliance with all applicable federal, state, and local laws, rules and regulations.

(e)     Agent hereby acknowledges that prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter- Closing Location transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Closing Location.

(f)     Agent hereby acknowledges that prior to the execution of this Agreement, and on the date immediately preceding the Inventory Date, Agent has had and shall have had the opportunity to inspect the Stores, the Distribution Center and the Merchandise.

### Section 12.    Insurance.

**12.1    Merchant's Liability Insurance.**  Until the Sale Termination Date, Merchant shall continue, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Closing Locations, and shall cause Agent to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, if requested by Agent, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change.  In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles unless said claim arises from or relates to the negligence or willful acts or omissions of Agent, in which case Agent shall be responsible for the payment of such deductibles.

**12.2    Merchant's Casualty Insurance.**  Until the Sale Termination Date, Merchant shall continue, in such amounts as it currently has in effect, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof.  In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds.  Prior to the Sale Commencement Date, if requested by Agent, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date or the Extended Sale Termination Date, as the case may be, without Agent's prior written consent.

**12.3    Worker's Compensation Insurance.**  Until the Sale Termination Date, Merchant shall continue, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, if requested by Agent, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

22

**12.4    Agent's Insurance.**  Agent shall maintain, at Agent's sole cost and expense throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability, general liability and umbrella and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be solely responsible for the payment of all deductibles unless such claim arises from or relates to the negligence or willful acts or omissions of Merchant, in which case Merchant shall pay such deductibles.

**12.5    Risk of Loss.**  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "**Agent Claim**").  In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the notice address listed in this Agreement.  If Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party at the respective address listed in Section 17.1 of this Agreement.  Agent and Merchant agree to provide one another with reasonable assistance in filing each of the types of insurance claims provided for in this Section 12.5.

### Section 13.    Indemnification.

**13.1    Merchant Indemnification.**  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "**Agent Indemnified Parties**") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from, or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

23

(b)      subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(b) and 4.1(c) and Section 9 hereof, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)      subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; and

(d)      the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent) or representatives.

**13.2**    **Agent Indemnification.**  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against, Merchant resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)      Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)      Agent's material breach of or failure to comply with any local, state, or federal laws or regulations;

(c)      any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors or other officers, directors or representatives of Agent;

(d)      any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(e)      any Agent Claims; and

(f)      the gross negligence or willful misconduct of Agent or any of its officers, directors, employees, agents, or representatives.

**Section 14.**    **[RESERVED]**

**Section 15.**    **Fixtures.**

At Merchant's sole election (the "**FF&E Election**"), exercisable by Merchant in writing on an individual location by location basis within ten (10) days after the Sale Commencement Date, Agent exclusively shall sell the Owned FF&E in any such location; provided however, Merchant shall have the right to designate certain Owned FF&E located at any of the Closing

24

Locations that Merchant does not elect to have Agent sell.  If Merchant exercises the FF&E Election with respect to the Owned FF&E in any Closing Location, Agent shall be entitled to receive a commission equal to **30 percent** (30%) of the proceeds from the sale of such Owned FF&E, net of sales taxes and expenses incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent and funded by Merchant; the institutions identified in Section 11.1 (c) have consented to Merchant funding such budgeted expenses.  Merchant may elect to receive in lieu of proceeds net of expenses and Agent's commission, a lump sum payment, on a per location basis, in an amount to be agreed upon between Merchant and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent.  On or before the applicable Vacate Date, if Merchant requests, Agent shall remove all Owned FF&E from the Closing Locations in keeping with the budgeted expenses as referred to previously in this Section 15.  Otherwise Agent shall leave all unsold FF&E at the Closing Location with no further responsibility therefore.  If Merchant elects to have someone other than Agent dispose of the Owned FF&E after the Sale Term, Agent agrees that it shall cooperate with such party to plan for such disposition after the Sale Term, <u>provided</u> <u>however</u>, it is understood that such planning shall not unreasonably interfere with Agent's conduct of the Sale.,

### Section 16.    Bidding Procedures.

Prior to the effectiveness of this Agreement, this Agreement is subject to the solicitation by Merchant of higher or otherwise competing bids.  In consideration of Agent conducting its due diligence and entering into this Agreement, which serves as a base by which other offers may be measured, Merchant agrees that if Agent is not the successful bidder at the Auction, Agent shall receive, from the gross proceeds actually received from the transaction consummated with the successful bidder, an amount sufficient to reimburse Agent for actual documented, third-party out of pocket expenses (e.g., independent contractor supervisors, signage, professional fees, etc.) in an aggregate amount not to exceed $15,000 (the "<u>Expense Reimbursement</u>"); <u>provided</u> that the amount of the Expense Reimbursement shall be subject to the approval of the Bankruptcy Court, upon notice and motion filed by Agent at its sole cost and expense.

### Section 17.    Miscellaneous.

**17.1    <u>Notices</u>.**  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, by electronic mail or a recognized overnight delivery service, as follows:

| If to Seller: | If to Agent: |
|---|---|
| SKI MARKET LTD, INC.<br>Attn:  Andrew Ferguson<br>466 Washington Street<br>Wellesley, MA 02481<br>Tel. (781) 419-2303<br>Fax. (781) 890-1811<br>Email:  AF@skimarket.com | Gordon Brothers Retail Partners, LLC<br>Attn:  Mitchell H. Cohen<br>101 Huntington Avenue, 10th Floor<br>Boston, MA  02199<br>Tel. 617-422-6207<br>Fax. 617-422-6266<br>Email:  <u>mcohen@gordonbrothers.com</u> |

1603953 v1/NY

| | |
|---|---|
| **With Copies to:**<br><br>MIRICK, O'CONNELL, DEMALLIE & LOUGEE, LLP<br>Attn:  Joseph H. Baldiga, Esq.<br>1700 West Park Drive<br>Westborough, MA  01581<br>Tel. (508) 860-1464<br>Fax. (508) 983-6264<br>Email: jbaldiga@mirickoconnell.com<br><br>COOLEY GODWARD KRONISH LLP<br>Attn:  Jay R. Indyke, Esq.<br>1114 Avenue of the Americas<br>New York, NY 10036<br>Tel. (212) 479-6000<br>Fax. (212) 479-6275<br>Email: jindyke@cooley.com<br><br>CRAIG AND MACAULEY PROFESSIONAL CORPORATION<br>Attn:  William Moorman, Esq.<br>Federal Reserve Plaza<br>600 Atlantic Avenue<br>Boston, MA 02210<br>Tel. (617) 367-9500<br>Fax. (617) 742-1788<br>Email:  moorman@craigmacauley.com | With Copies to:<br><br>Daniel Cohn, Esq.<br>Cohn, Whitesell & Goldberg, LLP<br>101 Arch Street<br>Boston, MA  02110<br>Tel.  617-951-2505<br>Fax:  617-951-0679<br>Email:  cohn@cwgll.com |

**17.2    Governing Law; Consent to Jurisdiction.**  This Agreement shall be governed and construed in accordance with the laws of the State of Massachusetts, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

**17.3    Entire Agreement.**  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

**17.4    Amendments.**  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

**17.5    No Waiver.**  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

**17.6    Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any chapter 11 or chapter 7 trustee.  Neither party may not assign its respective obligations under this Agreement without the prior written consent of the other party.

**17.7    Execution in Counterparts.**  This Agreement may be executed in as many counterparts as may be required, which counterparts may be delivered by facsimile or electronic mail, and it shall not be necessary that the signature of, or on behalf of, each party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more such counterparts.  All such counterparts when taken together shall constitute a single and legally binding agreement.

**17.8    Section Headings.**  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

**17.9    Survival.**  All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

**17.10    Reporting.**  Agent shall prepare weekly reports including, without limitation, reports that comply with Merchant's current weekly cash reporting to its central office, reflecting the progress of the Sale which shall specify the Proceeds received to date.  Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage rent obligations under Stores leases.  During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores so long as they do not unreasonably interfere with the conduct of the Sale.

**17.11    Obligations Joint and Several.**  All obligations of Agent to Merchant hereunder shall be joint and several.  Agent may utilize the services of subcontractors and or licensees in connection with the performance of its obligations hereunder.

**17.12    Security Interest**.  Upon payment of the Initial Guaranty Payment to Merchant and the issuance of the Guaranty L/C and the Expense L/C in favor of Merchant and in consideration of Agent's payment of the Guaranteed Amount, the Recovery Amount, if any, and Expenses, and the provision of services hereunder to Merchant, Merchant hereby grants to Agent

a first priority and senior security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of Merchant to Agent hereunder.  Upon payment of the Initial Guaranty Payment, and the issuance of the Guaranty L/C and the Expense L/C, the security interest granted to Agent hereunder shall be deemed properly perfected without the need for further filings or documentation.  Agent further agrees that if it fails to pay Merchant any portion of the Guaranteed Amount, Expenses, the Recovery Amount, or any other undisputed amounts due Merchant under this Agreement, and such failure shall continue for five (5) days after written notice by Merchant to Agent, then the security interest granted to Agent hereunder shall be deemed released in an amount equal to such unpaid amounts, provided however, the balance of Agent's security interest shall remain in full force and effect

**IN WITNESS WHEREOF,** Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**Gordon Brothers Retail Partners, LLC**

By: _____

    Name:  Timothy J. Shilling
    Title:  Director

**SKI MARKET LTD, INC.**

By: _____

    Name:
    Title:

CONSENTED AND AGREED TO AS TO
SECTION 17.12
BY SOUTH SHORE SAVINGS BANK
As Merchant's Secured Lender

By: _____
Name:
Title:

1603953 v1/NY

CONSENTED AND AGREED TO AS TO
SECTION 17.12
BY THE BURTON CORPORATION
As Merchant's Secured Creditor


By: _____
Name:
Title:

CONSENTED AND AGREED TO AS TO
SECTION 17.12
BY TECNICA GROUP USA CORPORATION
As Merchant's Secured Creditor


By: _____
Name:
Title:

CONSENTED AND AGREED TO AS TO
SECTION 17.12
BY BELL SPORTS, INC.
As Merchant's Secured Creditor


By: _____
Name:
Title:

1603953 v1/NY

# Exhibit 1

### CLOSING LOCATIONS LIST

| STORE NUMBER | STORE NAME | CITY |
|---|---|---|
|  |  |  |

# Exhibit 3.3(a)

**DEBTOR'S DESIGNATED BANK ACCOUNT**

# **Exhibit 3.3(b)**

### **FORM OF GUARANTY L/C**

[NAME OF ISSUING BANK]
[ADDRESS]

Date: _____, 2010

Irrevocable Standby Letter of Credit Number:_____

BENEFICIARY:      Ski Market LTD, Inc.
                  466 Washington Street
                  Wellesley, MA 02481

Credit Number:
Opener's Reference No:
Gentlemen:

BY ORDER OF:      [Agent]

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of [Agent] for a sum or sums not exceeding a total of $___,000,000 U.S. Dollars (____ Million Dollars) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2010, or such earlier date on which the beneficiary shall notify us in writing that this Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by a signed statement in the form attached as **Exhibit A**, and the original Letter of Credit.

Partial and/or multiple drawings are permitted.

Merchant may draw on the Letter of Credit if Agent fails to pay any amounts due by Agent to Merchant pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of _____, 2010 between Merchant and Agent.

This Letter of Credit may be increased or reduced from time to time upon receipt of a signed statement in the form attached as **Exhibit B**.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ _____ of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

1603953 v1/NY

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this letter of credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention , mention our reference number as it appears above. Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

## EXHIBIT A

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____
Re:  Drawing for Amounts Due to:

Ski Market LTD, Inc.
466 Washington Street
Wellesley, MA 02481

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officers of Ski Market LTD, Inc. ("Merchant") hereby certifies to you that:

(i)      _____ ("Agent") has not made a payment when due pursuant to that certain Agency Agreement dated as of _____, 2010 between the Merchant and Agent.

(ii)     The amount to be drawn is $_____ (the "Amount Owing").

(iii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the amount available on the date hereof to be drawn under the Letter of Credit.

(iv)     The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)      The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

> [Bank Name]
> [Bank Address]
> ABA No:
> Further Credit to: [Account Title]
> [Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this day of _____.

Very truly yours,

SKI MARKET LTD, INC.

By: _____
Title: _____

## **EXHIBIT B**

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____
Re:  Increase or Reduction of Face Amount:

Ski Market LTD, Inc.
466 Washington Street
Wellesley, MA 02481

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officers of Ski Market LTD, Inc. ("Merchant"), hereby certifies to you that the face amount of the Letter of Credit No. _____ hereby shall be increased/reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this day of _____.

Very truly yours,

SKI MARKET LTD, INC.

By:
Title:

1603953 v1/NY

# EXHIBIT 4.1

**OCCUPANCY EXPENSE SCHEDULE**

# Exhibit 4.2(b)

### FORM OF EXPENSE L/C

[NAME OF ISSUING BANK]
[ADDRESS]

Date: _____, 2010

Irrevocable Standby Letter of Credit Number:_____

BENEFICIARY:    Ski Market LTD, Inc.
466 Washington Street
Wellesley, MA 02481

Credit Number:
Opener's Reference No:
Gentlemen:

BY ORDER OF:    [Agent]

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of [Agent] for a sum or sums not exceeding a total of $___,000,000 U.S. Dollars (_____ Million Dollars) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2010, or such earlier date on which the beneficiary shall notify us in writing that this Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by a signed statement in the form attached as **Exhibit A**, and the original Letter of Credit.

Partial and/or multiple drawings are permitted.

Merchant may draw on the Letter of Credit if Agent fails to pay any amounts due by Agent to Merchant pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of _____, 2010 between Merchant and Agent.

This Letter of Credit may be increased or reduced from time to time upon receipt of a signed statement in the form attached as **Exhibit B**.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ _____ of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this letter of credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention , mention our reference number as it appears above. Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

## EXHIBIT A

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____
Re:  Drawing for Amounts Due to:

Ski Market LTD, Inc.
466 Washington Street
Wellesley, MA 02481

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officers of Ski Market LTD, Inc. ("Merchant") hereby certifies to you that:

(i)     Agent ("Agent") has not made a payment when due pursuant to that certain Agency Agreement dated as of _____, 2010 between the Merchant and Agent.

(ii)    The amount to be drawn is $_____ (the "Amount Owing").

(iii)   Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the amount available on the date hereof to be drawn under the Letter of Credit.

(iv)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)     The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

> [Bank Name]
> [Bank Address]
> ABA No:
> Further Credit to: [Account Title]
> [Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this day of _____.

Very truly yours,

SKI MARKET LTD, INC.

By: _____
Title: _____

1603953 v1/NY

## EXHIBIT B

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____
Re:  Increase or Reduction of Face Amount:

Ski Market LTD, Inc.
466 Washington Street
Wellesley, MA 02481

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officers of Ski Market LTD, Inc. ("Merchant"), hereby certifies to you that the face amount of the Letter of Credit No. _____ hereby shall be increased/reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this day of _____.

Very truly yours,

SKI MARKET LTD, INC.

By:
Title:

1603953 v1/NY

# Exhibit 5.1

## INVENTORY TAKING INSTRUCTIONS

[TO BE PROPOSED BY AGENT]